## O'MALLEY, COLLECTOR OF INTERNAL REVENUE, v. WOODROUGH ET UX.

No. 810. Argued April 28, 1939.—Decided May 22, 1939.

*Solicitor General Jackson,* with whom *Assistant Attorney General Morris,* and *Messrs. Sewall Key, Arnold Raum,* and *Joseph T. Votava* were on the brief, for appellant.

*Messrs. J. A. C. Kennedy* and *George L. DeLacy,* with whom *Messrs. Edward J. Svoboda* and *Ralph E. Svoboda* were on the brief, for appellees.

MR. JUSTICE FRANKFURTER delivered the opinion of the Court.

The case is here under § 2 of the Act of August 24, 1937 (50 Stat. 751), as a direct appeal from a judgment of a district court whose "decision was against the constitutionality" of an Act of Congress. The suit below, an action at law to recover a tax on income claimed to have been illegally exacted, was disposed of upon the pleadings and turned on the single question now before us, to wit: Is the provision of § 22 of the Revenue Act of 1932

(47 Stat. 169, 178), re-enacted by § 22 (a) of the Revenue Act of 1936 (49 Stat. 1648, 1657), constitutional insofar as it included in the "gross income," on the basis of which taxes were to be paid, the compensation of "judges of courts of the United States taking office after June 6, 1932."

That this is the sole issue will emerge from a simple statement of the facts and of the governing legislation. Joseph W. Woodrough was appointed a United States circuit judge on April 12, 1933, and qualified as such on May 1, 1933. For the calendar year of 1936 a joint income tax return of Judge Woodrough and his wife disclosed his judicial salary of $12,500, but claimed it to be constitutionally immune from taxation. Since it was not included in "gross income" no tax was payable. Subsequently a deficiency of $631.60 was assessed on the basis of that item, which, with interest, was paid under protest. Claim for refund having been rejected, the present suit was brought, and judgment went against the Collector. The assessment of the present tax was technically under the Act of 1936, but that Act merely carried forward the provisions of the Act of 1932, for the inclusion of compensation of "judges of courts of the United States, taking office after June 6, 1932" which had been similarly incorporated in the Revenue Act of 1934 (48 Stat. 680, 686–687). Therefore, the power of Congress to include Judge Woodrough's salary as a circuit judge in his "gross income" must be judged on the basis of the validity of § 22 of the Revenue Act of 1932, and not as though that power had been originally asserted by the Revenue Act of 1936. For it was the Act of June 6, 1932 that gave notice to all judges thereafter to be appointed, of the new Congressional policy to include the judicial salaries of such judges in the assessment of income taxes. The fact that Judge Woodrough before he became a circuit judge and prior to June 6, 1932, had been a district judge

is wholly irrelevant to the matter in issue. The two offices have different statutory origins, are filled by separate nominations and confirmations, and enjoy different emoluments. A new appointee to a circuit court of appeals occupies a new office no less when he is taken from the district bench than when he is drawn from the bar.

By means of § 22 of the Revenue Act of 1932, Congress sought to avoid, at least in part, the consequences of *Evans* v. *Gore,* 253 U. S. 245. That case, decided on June 1, 1920, ruled for the first time that a provision requiring the compensation received by the judges of the United States to be included in the "gross income" from which the net income is to be computed, although merely part of a taxing measure of general, non-discriminatory application to all earners of incomes, is contrary to Article III, § 1, of the Constitution which provides that the "Compensation" of the "Judges" "shall not be diminished during their Continuance in Office." See also the separate opinion of Mr. Justice Field in *Pollock* v. *Farmers' Loan & Trust Co.,* 157 U. S. 429, 586, 604 *et seq.* To be sure, in a letter to Secretary Chase, Chief Justice Taney expressed similar views.[1] In doing so, he merely gave his extra-judicial opinion, asserting at the same time that the question could not be adjudicated.[2] Chief Justice Taney's vigorous views were shared by Attorney General Hoar.[3] Thereafter, both the Treasury Department[4] and Con-

---

[1] The letter was written on February 16, 1863, and will be found in 157 U. S. 701.

[2] " . . . I should not have troubled you with this letter, if there was any mode by which the question could be decided in a judicial proceeding. But all of the judges of the courts of the United States have an interest in the question, and could not therefore with propriety undertake to hear and decide it." 157 U. S. at 702.

[3] 13 Op. A. G. 161; but see the opinion of Attorney General Palmer, 31 Op. A. G. 475.

[4] See Mr. Justice Field, concurring, in *Pollock* v. *Farmers' Loan & Trust Co.,* 157 U. S. 429, 588, 606–07.

gress [5] acted upon this construction of the Constitution. However, the meaning which *Evans* v. *Gore* imputed to the history which explains Article III, § 1, was contrary to the way in which it was read by other English-speaking courts.[6] The decision met wide and steadily growing disfavor from legal scholarship and professional opinion.[7] *Evans* v. *Gore* itself was rejected by most of the courts before whom the matter came after that decision.[8]

Having regard to these circumstances, the question immediately before us is whether Congress exceeded its constitutional power in providing that United States judges

[5] See *Wayne* v. *United States*, 26 Ct. Cl. 274; Act of July 28, 1892, c. 311, 27 Stat. 306.

[6] See Judgments in *Cooper* v. *Commissioner of Income Tax*, 4 Comm. L. R. 1304, construing § 17 of the Queensland Constitution Act of 1867 which prohibited "any reduction or diminution of the salary of a Judge during his Term of office"; also, *Judges* v. *Attorney-General for Saskatchewan* [1937] 2 D. L. R. 209, construing § 96 of the British North America Act, 1867, that "The Salaries . . . of the Judges . . . shall be fixed and provided by the Parliament of Canada" in connection with the Income Tax Act, 1932, of Saskatchewan.

[7] See Clark, *Further Limitations Upon Federal Income Taxation*, 30 YALE L. J. 75; Corwin, *Constitutional Law in 1919–1920*, 15 AM. POL. SCI. REV. 635, 641–644; Fellman, *Diminution of Judicial Salaries*, 24 IOWA L. REV. 89; Lowndes, *Taxing Income of Federal Judiciary*, 19 VA. L. REV. 153; Powell, *Constitutional Law in 1919–1920*, 19 MICH. L. REV. 117–118; Powell, *The Sixteenth Amendment and Income from State Securities*, NATIONAL INCOME TAX MAGAZINE (July 1923) 5–6; 20 COL. L. REV. 794; 43 HARV. L. REV. 318; 20 ILL. L. REV. 376; 45 L. Q. REV. 291; 7 VA. L. REV. 69; 3 U. OF CHI. L. REV. 141.

[8] The cases, *pro* and *con*, are collected in the recent dissenting opinion by Chief Judge Bond of the Court of Appeals of Maryland in *Gordy* v. *Dennis*, 5 A. 2d 69, 82. Particular attention should be called to the decision of the Supreme Court of South Africa, *Krause* v. *Commissioner for Inland Revenue*, [1929] So. Afr. R. (A. D.) 286, construing § 100 of the South Africa Act, which had taken over the identical clause from Article III, § 1, of our Constitution.

appointed after the Revenue Act of 1932 shall not enjoy immunity from the incidences of taxation to which everyone else within the defined classes of income is subjected. Thereby, of course, Congress has committed itself to the position that a non-discriminatory tax laid generally on net income is not, when applied to the income of a federal judge, a diminution of his salary within the prohibition of Article III, § 1, of the Constitution. To suggest that it makes inroads upon the independence of judges who took office after Congress had thus charged them with the common duties of citizenship, by making them bear their aliquot share of the cost of maintaining the Government, is to trivialize the great historic experience on which the framers based the safeguards of Article III, § 1.[9] To subject them to a general tax is merely to recognize that judges are also citizens, and that their particular function in government does not generate an immunity from sharing with their fellow citizens the material burden of the government whose Constitution and laws they are charged with administering.

After this case came here, Congress, by § 3 of the Public Salary Tax Act of 1939, amended § 22 (a) so as to make it applicable to "judges of courts of the United States who took office on or before June 6, 1932."[10] That section, however, is not now before us. But to the extent

---

[9] The provisions regarding security of salary had their source in the Act of Settlement of 1700, 12 & 13 Will. III, c. 2, § III, and the Act of 1760, 1 Geo. III, c. 23. See Holdsworth, *The Constitutional Position of the Judges*, 48 L. Q. REV. 25; 2 HOLDSWORTH, THE HISTORY OF ENGLISH LAW, 559–64; 6 *id*. 234, 514.

[10] Public No. 32, 76th Cong., 1st Sess., c. 59. Section 209 of the same statute, however, provides that "In the case of the judges of the Supreme Court, and of the inferior courts of the United States created under article III of the Constitution, who took office on or before June 6, 1932, the compensation received as such shall not be subject to income tax under the Revenue Act of 1938 or any prior revenue Act."

that what the Court now says is inconsistent with what was said in *Miles* v. *Graham*, 268 U. S. 501, the latter cannot survive.

*Judgment reversed.*

MR. JUSTICE MCREYNOLDS did not hear the argument in this cause and took no part in its consideration or decision.

MR. JUSTICE BUTLER, dissenting.

Concretely, the question is whether, by exacting from United States circuit judge Joseph W. Woodrough and his wife $631.60 in the form of income tax on his salary of $12,500 for 1936, the Government diminished the compensation for his services theretofore fixed by Congress. That item excluded, they had no taxable income. The judge's monthly pay was $1041.66. The tax took at the monthly rate of $52.63.

The material details may be given briefly.

April 12, 1933, Judge Woodrough was appointed judge of the United States circuit court of appeals for the eighth circuit. He qualified May 1, 1933. Congress had by the Act of December 13, 1926,[1] enacted that "To each of the circuit judges the sum of $12,500 per year" shall be paid as compensation. Since May 1, 1933, appellee has received the specified pay. The Revenue Act of June 6, 1932, applicable only to taxable years beginning after December 31, 1931, contained a provision declaring that in the case of judges taking office after that date "the compensation received as such shall be included in gross income; and all Acts fixing the compensation of such . . . judges are hereby amended accordingly."[2] The Revenue Act of 1934,[3] applicable only to taxable

---

[1] c. 6, 44 Stat. 919.

[2] § 22 (a), c. 209, 47 Stat. 169.

[3] § 22 (a), c. 277, 48 Stat. 680.

284

years beginning after December 31, 1933, and that of 1936,[4] applicable only to taxable years beginning after December 31, 1935, contain the same language as that just quoted from the Act of 1932.

Judge Woodrough and his wife made a joint income tax return for 1936; it disclosed his salary but claimed it was not subject to the tax. The commissioner held the item taxable and made a deficiency assessment of $631.60. Plaintiffs paid under protest and filed claim for refund; it was denied. Claiming the tax that they were so compelled to pay diminished the judge's compensation and that therefore § 22 (a) of the Act of 1936 violates § 1, Art. III, of the Constitution, plaintiffs sued to recover the amount of the tax. The collector moved to dismiss. The court held the Act unconstitutional, overruled the motion and, defendant having elected not to plead further, gave plaintiffs judgment as prayed. Defendant appealed.[5]

Article III, § 1, declares: "The Judges, both of the supreme and inferior Courts, shall hold their Offices during good Behaviour, and shall, at stated Times, receive for their Services, a Compensation, which shall not be diminished during their Continuance in Office."

It safeguards the independence of the judiciary. The abuse against which it was intended to be a barrier is included in the list of reasons for our Declaration of Independence. "The history of the present King of Great Britain is a history of repeated injuries and usurpations, all having in direct object the establishment of an absolute Tyranny over these States . . . He has obstructed the Administration of Justice, by refusing his Assent to Laws for establishing Judiciary powers.—He has made Judges dependent on his Will alone, for the

[4] § 22 (a), c. 690, 49 Stat. 1648.
[5] Act of August 24, 1937, § 2, c. 754, 50 Stat. 752.

tenure of their offices, and the amount and payment of their salaries."

Alexander Hamilton, explaining the reasons for and the purpose of § 1 of Art. III, said:

"The Executive not only dispenses the honors, but holds the sword of the community. The legislature not only commands the purse, but prescribes the rules by which the duties and rights of every citizen are to be regulated. The judiciary, on the contrary, has no influence over either the sword or the purse; no direction either of the strength or of the wealth of the society; and can take no active resolution whatever. It may truly be said to have neither *force* nor *will*, but merely judgment . . .

"This simple view of the matter . . . proves incontestably, that the judiciary is beyond comparison the weakest of the three departments of power; that it can never attack with success either of the other two; and that all possible care is requisite to enable it to defend itself against their attacks . . .

"The complete independence of the courts of justice is peculiarly essential in a limited Constitution. By a limited Constitution, I understand one which contains certain specified exceptions to the legislative authority; such, for instance, as that it shall pass no bills of attainder, no *ex-post-facto* laws, and the like. Limitations of this kind can be preserved in practice no other way than through the medium of courts of justice, whose duty it must be to declare all acts contrary to the manifest tenor of the Constitution void. Without this, all the reservations of particular rights or privileges would amount to nothing . . ." (The Federalist, No. 78.)

"Next to permanency in office, nothing can contribute more to the independence of the judges than a fixed provision for their support . . . In the general course of human nature, *a power over a man's subsistence amounts*

*to a power over his will* . . . The enlightened friends to good government in every State, have seen cause to lament the want of precise and explicit precautions in the State constitutions on this head. Some of these indeed have declared that *permanent* salaries should be established for the judges, but the experiment has in some instances shown that such expressions are not sufficiently definite to preclude legislative evasions. Something still more positive and unequivocal has been evinced to be requisite . . . This provision for the support of the judges bears every mark of prudence and efficacy; and it may be safely affirmed that, together with the permanent tenure of their offices, it affords a better prospect of their independence than is discoverable in the constitutions of any of the States in regard to their own judges." (The Federalist, No. 79.)

Mr. Justice Story declared that "Without this provision, the other, as to the tenure of office, would have been utterly nugatory, and indeed a mere mockery . . ." 2 Story, §. 1628. Chancellor Kent said: "The provision for the permanent support of the judges is well calculated, in addition to the tenure of their office, to give them the requisite independence. It tends, also, to secure a succession of learned men on the bench, who, in consequence of a certain undiminished support, are enabled and induced to quit the lucrative pursuits of private business for the duties of that important station. The Constitution of the United States, on this subject, was an improvement upon all our previously existing constitutions." 1 Kent Com. 294.

The first judicial construction of the clause was by the circuit court of the District of Columbia in 1803 in the case of *United States v. More.*[6] The opinion was written by Judge Cranch. The court sustained a demurrer to an

---

[6] The opinion is set forth in a footnote at p. 160 *et seq.*, 3 Cranch.

indictment charging that More, a justice of the peace, under color of his office, exacted an illegal fee, 12 cents, for giving judgment upon a warrant for a small debt. The issue was whether an Act of Congress abolishing fees of justices of the peace in the District of Columbia could affect those who accepted their commissions while the fees were legally annexed to the office. The court said: "The 3d article of the constitution provides for the independence of the judges of the courts of the United States, by certain regulations; one of which is, that they shall receive, at stated times, a compensation for their services, *which shall not be diminished during their continuance in office*. The act of congress of 27th of February, 1801, which constitutes the office of justices of the peace . . . ascertains the compensation which they shall have for their services in holding their courts . . . This compensation is given in the form of fees, payable when the services are rendered . . . That his [the justice's] compensation shall not be diminished during his continuance in office, seems to follow as a necessary consequence from the provisions of the constitution . . . If his compensation has once been fixed by law, a subsequent law for diminishing that compensation (*a fortiori* for *abolishing* it) cannot affect that justice of the peace during his continuance in office; . . ."

The first attempt to tax compensation of federal judges was during the Civil War. Section 86 of the Act of July 1, 1862,[7] levied "on all salaries of officers, or payments to persons in the . . . service of the United States . . . when exceeding the rate of six hundred dollars per annum, a duty of three per centum on the excess above the said six hundred dollars," and directed disbursing officers to deduct and withhold the duty. These general provisions were construed by the revenue

---

[7] c. 119, 12 Stat. 472.

officers to comprehend the compensation of the President and the judges of the United States. By letter of February 16, 1863, Mr. Chief Justice Taney protested to the Secretary of the Treasury. In the course of his letter,[8] he said:

"The act in question, as you interpret it, diminishes the compensation of every judge three per cent, and if it can be diminished to that extent by the name of a tax, it may in the same way be reduced from time to time at the pleasure of the legislature.

"The Judiciary is one of the three great departments of the government, created and established by the Constitution. Its duties and powers are specifically set forth, and are of a character that requires it to be perfectly independent of the two other departments, and in order to place it beyond the reach and above even the suspicion of any such influence, the power to reduce their compensation is expressly withheld from Congress, and excepted from their powers of legislation.

"Language could not be more plain than that used in the Constitution. It is moreover one of its most important and essential provisions. For the articles which limit the powers of the legislative and executive branches of the government, and those which provide safeguards for the protection of the citizen in his person and property, would be of little value without a judiciary to uphold and maintain them, which was free from every influence, direct or indirect, that might by possibility in times of political excitement warp their judgments. . . .

"Having been honored with the highest judicial station under the Constitution, I feel it to be more especially my duty to uphold and maintain the constitutional rights of that department of the government, and not by any act or word of mine, leave it to be supposed that I acquiesce in a measure that displaces it from the independent posi-

[8] Printed in 157 U. S. at p. 701.

tion assigned it by the statesmen who framed the Constitution; and in order to guard against any such inference, I present to you this respectful but firm and decided remonstrance against the authority you have exercised under this act of Congress, and request you to place this protest upon the public files of your office as the evidence that I have done everything in my power to preserve and maintain the Judicial Department in the position and rank in the government which the Constitution has assigned to it."

The letter of the Chief Justice was not answered and, at his request, the Court, May 10, 1863, ordered the letter entered on its records. In 1869, the Secretary of the Treasury requested the opinion of Attorney General Ebenezer Rockwood Hoar as to the constitutionality of the Act construed to extend to judges' salaries. He rendered an opinion in substantial accord with the views expressed in Chief Justice Tàney's protest. 13 Op. A. G. 161. Accordingly, the tax on the compensation of the President and of judges was discontinued and the amounts theretofore collected from them were refunded— some through administrative channels; others through action of the court of claims and ensuing appropriations by Congress. See *Wayne v. United States,* 26 C. Cls. 274, 290; 27 Stat. 306.

In 1889, Mr. Justice Miller, a member of the Court since 1862, said: [9]

"The Constitution of the United States has placed several limitations upon the general power [of taxation], and . . . some of them are implied. One of its provisions is that neither the President of the United States (Art. II, sec. 1, par 6), nor a judge of the Supreme or inferior courts (Art III, sec. 1), shall have his salary diminished during the period for which he shall have been elected, or during his continuance in office. It is very clear that

---

[9] Miller on the Constitution of the United States p. 247.

when Congress, during the late [Civil] war, levied an income tax, and placed it as well upon the salaries of the President and the judges of the courts as those of other people, that it was a diminution of them to just that extent."

Although the Income Tax Act of 1894 said nothing about the compensation of the judges, Mr. Justice Field construed § 33 [10] to tax that compensation and assigned that ground among others for joining in the decision that the Act was unconstitutional. *Pollock* v. *Farmers' Loan & Trust Co.,* 157 U. S. 429, 604–606. Mr. Justice Field, who was confirmed the day this Court ordered Chief Justice Taney's letter entered on its records, had taken his place upon this bench at the beginning of the following term. His opinion recited the facts of that incident and quoted extensively from the letter, which was printed as an appendix to the volume of the reports containing the opinions in the *Pollock* case. 157 U. S. 701. The Justice ended his discussion of the matter by stating his belief, based on information, that the opinion of Attorney General Hoar had been followed ever since without question by the Treasury. And, upon reargument of the cause, Attorney General Olney said in his brief: "There has never been a doubt since the opinion of Attorney General Hoar that the salaries of the President and judges were exempt."

The Revenue Acts of 1913 [11] and 1916,[12] being the first two after adoption of the Sixteenth Amendment, ex-

---

[10] Section 33, 28 Stat. 557, in terms was much like § 86 of the Act of 1862; it levied "on all salaries of officers, or payments . . . to persons in the . . . service of the United States, . . . when exceeding the rate of four thousand dollars per annum, a tax of two per centum on the excess above the said four thousand dollars" and made it the duty of disbursing officers to deduct and withhold the tax.

[11] § 2B, 38 Stat. 168.

[12] § 4, 39 Stat. 759.

pressly. excluded from gross income the compensation of judges then in office. But after this country engaged in the World War, the Revenue Act of 1918, approved February 24, 1919, defined gross income to include "in the case of the President . . . [and] the judges of the Supreme and inferior courts . . . the compensation received as such." [13] The reports of the congressional committees having the measure in charge indicate that the Congress was in doubt as to the constitutional validity of that provision and intended to have the question decided by the courts.[14] The question was raised and presented for decision in *Evans* v. *Gore,* 253 U. S. 245. The Collector included the salary for 1918 of Judge Evans, appointed before enactment of the taxing statute, in gross income. Had it been excluded, he would have had no taxable income. He paid the tax and brought suit to recover the amount so exacted. The United States district court for the western district of Kentucky held him not entitled to recover. But, after argument by eminent counsel including the Solicitor General, this Court held that the clause declaring that compensation of judges "shall not be diminished during their continuance in office" prevents diminution by taxation and that it has been so construed in the actual practice of the government.

For the purpose of disclosing the reasons for and true meaning of the clause forbidding diminution of compensation of judges, the opinion of the Court, written by Mr. Justice Van Devanter, brought forward statements of Alexander Hamilton, Chief Justice Marshall, Justice Story, Chancellor Kent, Chief Justice Taney, Justice Field, Attorneys General Hoar and Olney and others.

[13] § 213 (a), 40 Stat. 1062.
[14] H. Rept. No. 767, 65th Cong., 2d sess., p. 29; Sen. Rept. No. 617, 65th Cong., 3d sess., p. 6; 56 Cong. Rec., p. 10370.

Speaking for the Court, he said:

"With what purpose does the Constitution provide that the compensation of the judges 'shall not be diminished during their continuance in office'? Is it primarily to benefit the judges, or rather to promote the public weal by giving them that independence which makes for an impartial and courageous discharge of the judicial function? Does the provision merely forbid direct diminution, such as expressly reducing the compensation from a greater to a less sum per year, and thereby leave the way open for indirect, yet effective, diminution, such as withholding or calling back a part as a tax on the whole? Or, does it mean that the judge shall have a sure and continuing right to the compensation, whereon he confidently may rely for his support during his continuance in office, so that he need have no apprehension lest his situation in this regard may be changed to his disadvantage?

". . . The primary purpose of the prohibition against diminution was not to benefit the judges, but, like the clause in respect of tenure, to attract good and competent men to the bench and to promote that independence of action and judgment which is essential to the maintenance of the guaranties, limitations and pervading principles of the Constitution and to the administration of justice without respect to persons and with equal concern for the poor and the rich. Such being its purpose, it is to be construed, not as a private grant, but as a limitation imposed in the public interest; in other words, not restrictively, but in accord with its spirit and the principle on which it proceeds.

"Obviously, diminution may be effected in more ways than one. Some may be direct and others indirect, or even evasive as Mr. Hamilton suggested. But all which by their necessary operation and effect withhold or take from the judge a part of that which has been promised by

law for his services must be regarded as within the prohibition. Nothing short of this will give full effect to its spirit and principle. Here the plaintiff was paid the full compensation, but was subjected to an involuntary obligation to pay back a part, and the obligation was promptly enforced. Of what avail to him was the part which was paid with one hand and then taken back with the other? Was he not placed in practically the same situation as if it had been withheld in the first instance? Only by subordinating substance to mere form could it be held that his compensation was not diminished . . .

"The prohibition is general, contains no excepting words and appears to be directed against all diminution, whether for one purpose or another; and the reasons for its adoption, as publicly assigned at the time and commonly accepted ever since, make with impelling force for the conclusion that the fathers of the Constitution intended to prohibit diminution by taxation as well as otherwise,—that they regarded the independence of the judges as of far greater importance than any revenue that could come from taxing their salaries. . . .

"When we consider . . . what is comprehended in the congressional power to tax,—where its exertion is not directly or impliedly interdicted,—it becomes additionally manifest that the prohibition now under discussion was intended to embrace and prevent diminution through the exertion of that power; for, as this court repeatedly has held, the power to tax carries with it 'the power to embarrass and destroy'; may be applied to every object within its range 'in such measure as Congress may determine'; enables that body 'to select one calling and omit another, to tax one class of property and to forebear to tax another'; and may be applied in different ways to different objects so long as there is 'geographical uniformity' in the duties, imposts and excises imposed. [Citing.] Is it not therefore morally certain that the discern-

ing statesmen who framed the Constitution and were so sedulously bent on securing the independence of the judiciary intended to protect the compensation of the judges from assault and diminution in the name or form of a tax? Could not the purpose of the prohibition be wholly thwarted if this avenue of attack were left open? Certainly there is nothing in the words of the prohibition indicating that it is directed against one legislative power and not another; and in our opinion due regard for its spirit and principle requires that it be taken as directed against them all."

Mr. Justice Holmes wrote a dissenting opinion, in which Mr. Justice Brandeis joined. With that expression his opposition to the decision ended. Two years later, in *Gillespie* v. *Oklahoma*, 257 U. S. 501, writing for the Court, invalidating a state tax upon net income of a lessee from sales of his share of oil and gas received under leases of restricted Indian land, he said (p. 505): "In cases where the principal is absolutely immune from interference an inquiry is allowed into the sources from which net income is derived and if a part of it comes from such a source the tax is *pro tanto* void; *Pollock* v. *Farmers' Loan & Trust Co.*, 157 U. S. 429; 158 U. S. 601; a rule lately illustrated by *Evans* v. *Gore* . . ." And in that case he relied on the truth, as put by Chief Justice Marshall in *M'Culloch* v. *Maryland*, 4 Wheat. 316, 431, that "the power to tax involves the power to destroy." He quoted (p. 505) with approval from *Indian Oil Co.* v. *Oklahoma*, 240 U. S. 522, the statement of the opinion (p. 530) that "A tax upon the leases is a tax upon the power to make them, and could be used to destroy the power to make them." [15]

---

[15] *Gillespie* v. *Oklahoma* is one of the decisions subjected to condemnatory comment in the concurring opinion in *Graves* v. *New York ex rel. O'Keefe*, 306 U. S. 466. It is there said: "A succession of

*Miles* v. *Graham* (1925), 268 U. S. 501, held invalid
§ 213 (a), Revenue Act of 1918, (condemned in *Evans* v.
*Gore*) when applied to compensation of Judge Graham,

decisions [*Gillespie* v. *Oklahoma* is the first cited] thereby withdrew
from the taxing power of the States and Nation a very considerable
range of wealth without regard to the actual workings of our federal-
ism, and this, too, when the financial needs of all governments began
steadily to mount."

At another place in that concurrence, the writer stated: "The
volume of the Court's business has long since made impossible the
early healthy practice whereby the Justices gave expression to indi-
vidual opinions. But the old tradition still has relevance when an
important shift in constitutional doctrine is announced after a re-
construction in the membership of the Court. . . . The arguments
upon which *McCulloch* v. *Maryland*, 4 Wheat. 316, rested . . . have
been distorted by sterile refinements unrelated to affairs. These
refinements derived authority from an unfortunate remark in the
opinion in *McCulloch* v. *Maryland*. Partly as a flourish of rhetoric
and partly because the intellectual fashion of the times indulged a
free use of absolutes, Chief Justice Marshall gave currency to the
phrase that 'the power to tax involves the power to destroy.' . . .
The web of unreality spun from Marshall's famous dictum was
brushed away by one stroke of Mr. Justice Holmes's pen: 'The power
to tax is not the power to destroy while this Court sits'. *Panhandle
Oil Co.* v. *Mississippi*, 277 U. S. 218, 223 (dissent)."

But, in the *Gillespie* case, Mr. Justice Holmes, speaking for the
Court, had definitely applied the doctrine that the power to tax does
involve the power to destroy.

In the *Panhandle* case neither the Court, nor indeed another jus-
tice dissenting, was impressed by "The power to tax is not the power
to destroy while this Court sits." The statement is vague and may
be read to imply a power that this Court never possessed. If taken
to mean that we are empowered to regulate or to limit the exertion
by Congress of its power of taxation, it justly may be regarded as
hyperbole; if taken to mean that this Court has power to prevent
imposition by Congress of taxes laid to discourage, to destroy, or
to protect, then it is in the teeth of the law. See, e. g., *Veazie Bank
v. Fenno*, 8 Wall. 533, 548; *McCray* v. *United States*, 195 U. S.
27, 53 *et seq.*; *Magnano Co.* v. *Hamilton*, 292 U. S. 40, 44 *et seq.*;
*Cincinnati Soap Co.* v. *United States*, 301 U. S. 308.

appointed after its enactment. Mr. Justice Holmes joined in the decision. Mr. Justice Brandeis merely noted dissent.

In the course of the opinion, we said:

"Does the circumstance that defendant in error's appointment came after the taxing Act require a different view concerning his right to exemption? The answer depends upon the import of the word 'compensation' in the constitutional provision.

"The words and history of the clause indicate that the purpose was to impose upon Congress the duty definitely to declare what sum shall be received by each judge out of the public funds and the times for payment. When this duty has been complied with the amount specified becomes the compensation which is protected against diminution during his continuance in office.

". . . The compensation fixed by law when defendant in error assumed his official duties was $7,500 per annum, and to exact a tax in respect of this would diminish it within the plain rule of *Evans* v. *Gore*.

"The taxing Act became a law [February 24, 1919] prior to the statute prescribing salaries for judges of the Court of Claims [approved February 25, 1919], but if the dates were reversed it would be impossible to construe the former as an amendment which reduced salaries by the amount of the tax imposed. No judge is required to pay a definite percentage of his salary, but all are commanded to return, as a part of 'gross income,' 'the compensation received as such' from the United States. From the 'gross income' various deductions and credits are allowed, as for interest paid, contributions or gifts made, personal exemptions varying with family relations, etc., and upon the net result assessment is made. The plain purpose was to require all judges to return their compensation as an item of 'gross income,' and to tax this as other salaries. This is forbidden by the Constitution.

"The power of Congress definitely to fix the compensation to be received at stated intervals by judges thereafter appointed is clear. It is equally clear, we think, that there is no power to tax a judge of a court of the United States on account of the salary prescribed for him by law."

In *O'Donoghue* v. *United States* (1933), 289 U. S. 516, we·construed the Act of June 30, 1932 [16] reducing the salaries of all ·judges "except judges whose compensation may not, under the Constitution, be diminished during their continuance in office." We there held that the supreme court and court of appeals of the District of Columbia were constitutional courts and therefore that the judges of those courts were excepted from the salary reduction. We cited the authorities, adopted the reasoning, and reaffirmed the conclusions on which rest the Court's judgments in *Evans* v. *Gore* and *Miles* v. *Graham*. And see *Booth* v. *United States,* 291 U. S: 339.

Evidently the Court intends to destroy the decision in *Evans* v. *Gore*. Without suggesting that there is any distinction between that case and *Miles* v. *Graham,* it declares that the latter "cannot survive." But the decision of today fails to deal with, much less to detract from the reasoning of those cases. The opinion would imply that the letter of Chief Justice Taney to the Secretary of the Treasury, and the separate opinion of Mr. Justice Field in the *Pollock* case were treated as having weight as· judicial decisions. But nowhere has that ever been suggested. However, all who are familiar with our judicial history know that entitled to great respect are the reasoned conclusions of these eminent American jurists as to the true intent and meaning of the Constitution of the United States. And similarly worthy of attention are, the opinions of the Attorneys General and other public officials following the reasoning of Chief Justice Taney.

---

[16] §§ 106, 107, 47 Stat. 401, 402.

298

Now the Court cites, as if entitled to prevail against those well-sustained opinions and the deliberate judgments of this Court, opposing views—if indeed upon examination they reasonably may be so deemed—of English speaking judges in foreign countries.

It refers, footnote 6, to the decision of the Privy Council in *Judges v. Attorney-General of Saskatchewan* (1937), 2 D. L. R. 209, construing income tax statutes of Saskatchewan. Neither the Dominion nor the Province has any law forbidding diminution of compensation of judges while in office and that decision has nothing to do with the question before us. The Australian and South African cases cited, footnotes 6 and 8, involved construction of income tax statutes under constitutions or charters created by legislative enactments and subject to authoritative interpretation or change by the local or British parliament. They shed no light upon the issue in this case.

The opinion claims no support from any state court decision. The one it cites, footnote 8, that of the Maryland Court of Appeals in *Gordy* v. *Dennis*, 5 A. 2d 69, held that under a clause in the Constitution of Maryland like that in Art. III, § 1, the compensation of state judges may not be taxed.

The opinion also cites, footnote 7, selected gainsaying writings of professors,—some are lawyers and some are not—but without specification of or reference to the reasons upon which their views rest. And in addition it cites notes published in law reviews, some signed and some not; presumably the latter were prepared by law students.

The suggestion that, as citizens, judges are not immune from taxation begs the question here presented. The Constitution itself puts judges in a separate class, declaring that at stated times they shall receive for their services compensation which "shall not be diminished." And so their salaries are distinguished from income of

others. The immunity extends only to compensation for their services. No question of comparison or reasonableness is involved.

Admittedly the Court now repudiates its earlier decisions upon the point here in issue. The provision defining tenure and providing for undiminishable compensation was adopted with unusual accord. There has been unanimity of opinion that, because in comparison with the legislative and executive the judicial department is weak, its independence is essential to our system of government. These safeguards go far to insure that independence. And, from the beginning, statesmen and jurists have agreed that the clause forbids diminution of judges' compensation by any form of legislation. The clause in question is plain: no exception is expressed; none may be implied. Its unqualified command should be given effect.

For one convinced that the judgment now given is wrong, it is impossible to acquiesce or merely to note dissent. And so this opinion is written to indicate the grounds of opposition and to evidence regret that another landmark has been removed.

I am of opinion that the judgment of the district court should be affirmed.