185 F.3d 1356 (Fed. Cir. 1999)
 JUDGE TERRY J. HATTER, JR., MARY MARTIN ARCENEAUX, on behalf of the late Judge George Arceneaux, Jr., JUDGE PETER H. BEER, JUDGE DUDLEY H. BOWEN, JR., DOLORES LEE BURCIAGA, executrix of the estate of Chief Judge Juan G. Burciaga, JUDGE A.J. MCNAMARA, JUDGE HARRY PREGERSON, JUDGE RAUL A. RAMIREZ, JUDGE NORMAN C. ROETTGER, JR., CHIEF JUDGE THOMAS A. WISEMAN, JR., CHIEF JUDGE TERENCE T. EVANS, JUDGE HENRY A. MENTZ, JR., CHIEF JUDGE WILBUR D. OWENS, JR., JUDGE HENRY R. WILHOIT, JR., JUDGE HAROLD A. BAKER and CHIEF JUDGE MICHAEL M. MIHM, Plaintiffs-Appellants,
v.
UNITED STATES, Defendant-Appellee.
 97-5093
 United States Court of Appeals for the Federal Circuit
 DECIDED: August 5, 1999
 
 Appealed from: United States Court of Federal Claims Judge James T. TurnerSteven S. Rosenthal, Morrison & Foerster LLP, of Washington, DC, argued for plaintiffs-appellants. With him on the brief were W. Stephen Smith and Jonathan S. Gowdy. Of counsel on the brief were Ellen E. Deason, Assistant Professor, University of Illinois, College of Law, of Champaign, Illinois.
 Jeanne E. Davidson, Assistant Director, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for defendant-appellee. With her on the brief was David M. Cohen, Director. Of counsel on the brief were Mildred L. Seidman, Chief, Court of Federal Claims Section, Tax Division, Department of Justice; and Luke Levasseur, Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC.
 Before PLAGER, Circuit Judge, ARCHER, Senior Circuit Judge, and RADER, Circuit Judge.
 PLAGER, Circuit Judge.
 
 
 1
 Terry J. Hatter, Jr., et al. appeal the damages calculation of the Court of Federal Claims, Hatter v. United States, 38 Fed. Cl. 166 (1997) (Hatter VI), on remand from this court's decision in Hatter v. United States, 64 F.3d 647 (Fed. Cir. 1995) (Hatter IV).[1] In Hatter IV, we held that the Compensation Clause of the United States Constitution, art. III, § 1, forbids diminishment of the compensation of Article III judges once in office and that the imposition of social security taxes on a judge's pay after taking office unconstitutionally diminishes the judge's compensation. Because the Court of Federal Claims improperly calculated the damages award due to the diminution, we reverse and remand the matter for further proceedings.
 
 BACKGROUND
 
 2
 The facts of this case have been discussed in detail in our previous two decisions, Hatter IV and Hatter II. The pertinent facts are that the Hospital Insurance (HI) tax (i.e., Medicare) was imposed upon federal judges for the first time on January 1, 1983, pursuant to the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. No. 97-248, § 278(a), 96 Stat. 324, 559 (1982) (codified as amended at 26 U.S.C. (I.R.C.) § 3121(u) (1988)). The Old Age Survivors and Disability Insurance tax (OASDI) was first imposed upon federal judges on January 1, 1984, pursuant to the Social Security Amendments of 1983, Pub. L. No. 98-21, § 101(a)(1), (b)(1) and (d), 97 Stat. 65, 68, 69 (codified as amended at 26 U.S.C. (I.R.C.) § 3121(b)(5)(E) (1988) and 42 U.S.C. § 410(a)(5)(E) (1988)). The plaintiff judges asserted that their compensation was diminished in violation of the Compensation Clause, U.S. Const., art. III, § 1.
 
 
 3
 In Hatter I, the Court of Federal Claims dismissed the judges' claim for lack of jurisdiction, viewing it as a tax refund claim. We reversed in Hatter II, holding that the judges' claim was under the Compensation Clause for money damages. On remand, the Court of Federal Claims in Hatter III again dismissed the judges' claim, holding that there was no constitutional diminution because the taxes imposed were nondiscriminatory and generally applicable to the public. We reversed that judgment in Hatter IV. We held that the judges' compensation had been unconstitutionally diminished by taxes imposed after they took office and remanded the case for calculation of damages for sums improperly withheld. The Supreme Court granted certiorari; our judgment was affirmed in Hatter V due to lack of a quorum.[2]
 
 
 4
 On remand, the Court of Federal Claims awarded damages only to the eight original judges[3] who were parties to the original complaint filed on December 29, 1989. Moreover, damages were limited to the amount of OASDI taxes withheld in January 1984 for services rendered in December 1983, before the period covered by the retroactive 1984 salary increase. The 1984 and subsequent pay raises of the judges were determined by the court to be more than sufficient to offset the OADSI taxes imposed in subsequent years. All other claims for damages, i.e., the OASDI claim of the later-filing judges and the later-filed HI claim of all the judges, were denied.
 
 
 5
 The Court of Federal Claims determined that the continuing claim doctrine did not apply to the judges' salary payments and, as a result, the OASDI claims of the later-filing judges and the HI claims of all the judges were barred by the statute of limitations. The court also determined that, even if the continuing claim doctrine could be applied to the judges' salary payments, salary increases had more than offset any compensation diminution caused by the imposition of OASDI and HI taxes during the six-year limitations period.
 
 DISCUSSION
 
 6
 As a preliminary matter, the judges assert that Hatter VI "did not implement [the] mandate" of Hatter IV because the Court of Federal Claims reconsidered the question of whether the social security taxes effected a diminution in salary. In Hatter IV, we stated:
 
 
 7
 Social Security taxes diminish the compensation of Article III judges who took office prior to enactment of the taxes. This court therefore reverses and remands the case for tax refunds or recoveries for the sums improperly withheld from the claimants' salaries.
 
 
 8
 Hatter IV, 64 F.3d at 653 (emphasis added). That language is clear. We determined that a new tax on a sitting Article III judge effected an unlawful diminution of that judge's compensation. Having decided the liability question, the remand was for the purpose of ascertaining the damages for that violation, i.e., "for the sums improperly withheld."
 
 
 9
 The controlling question in this appeal is whether the Government is correct that an unconstitutional diminution in the compensation of a group of judges, resulting from a tax unlawfully applied, may be fully offset by any and all future salary increases generally granted to the judiciary. The Government's position was adopted by the trial court.
 
 
 10
 We conclude that the Government's argument is fundamentally flawed, and results in a trivialization of the constitutional protection accorded judges by Article III, § 1, the Compensation Clause.[4] The consequence of the Government's argument subverts the very purpose of the Compensation Clause, and is wrong, both in law and in policy.
 
 1.
 
 11
 The purpose of the Constitution's Compensation Clause - federal judges shall receive "a Compensation, which shall not be diminished during their Continuance in Office" - is to protect and preserve the independence of the judiciary. This purpose, and the reasons for this salutary protection of judicial independence, are well understood and well documented. A reader unfamiliar with the literature on the subject will find a thorough introduction to the matter in the Supreme Court's seminal opinion in Evans v. Gore, 253 U.S. 245 (1920).[5]
 
 
 12
 To understand the significance of this issue, it is necessary to put it in its historical context. The Administrative Office of the U.S. Courts uses 1969 as the benchmark for measuring changes in judicial salaries; that was the year that the first Quadrennial Salary Commission's recommendations were substantially implemented by Congress and the President. The Quadrennial Salary Commission was created in an attempt to take the salaries of the judiciary, Congress, and senior executive officials out of politics, and to base salary increases for these officials on cost-of-living changes similar to those granted to General Schedule federal employees. As the history since 1969 illustrates, the attempt failed.[6]
 
 
 13
 Since 1969, with a few notable exceptions, judicial salaries have not kept pace with annual increases in inflation. Overall, measured in terms of purchasing power, judges' salaries have declined since 1969 by more than 23 percent. This did not happen as a result of actions by Congress directly reducing the compensation of judges, in which case it would have been remediable under the Constitution. Rather, it results from the political environment in which annual Congressional appropriations of funds for the judiciary occur.
 
 
 14
 For budgeting purposes, judges' salaries are tied to salaries of elected officials, including those of Congress. Because Congress rarely grants itself salary increases, the judiciary rarely receives increases, even those promised and scheduled as cost-of-living adjustments. The history of the linkage between congressional salaries and judicial salaries is long and complicated. Simply put, Title 2, U.S.C. § 135 (for district judges; similar provisions apply to the compensation of other Article III judges) ties judicial salaries to Section 205 of Title 2. Section 205, the "Adjustment Act," provides for an annual cost-of-living salary adjustment for judges, members of Congress, and Executive Schedule officials when the rates of pay of employees under the General Schedule are adjusted for inflation; the Ethics Reform Act of 1989, Pub. L. No. 101-194, 103 Stat. 1716, keyed the adjustment to the index known as the Employment Cost Index - ECI.
 
 
 15
 Congress made a valiant effort in connection with the 1989 Ethics Reform Act to play catch-up. Salaries of top government officials, and judges, which for years had been lagging behind inflation, were adjusted in the amount of 7.9% in 1990 and 29.5% in 1991. This was followed in 1992 and 1993 by the promised annual inflationary adjustments pursuant to the Adjustment Act, and as indicated by the ECI. Since then, in every fiscal year (except one, 1994), General Schedule employees have had their salaries adjusted in response to increases in the ECI; however, in every fiscal year (except one, 1998), Congress, dealing with its own political concerns, denied the promised similar adjustment to judges.
 
 
 16
 Thus, despite occasional gains, judges' salaries remain substantially behind the cost-of-living index, even taking into account the recent relatively modest increases in inflation. The issue is hardly the dollar cost of the needed adjustment in judicial salaries - the entire judiciary budget constitutes two-tenths of one percent (0.2%) of the annual budget of the Federal Government, and the salaries of Article III judges constitute only seven percent (7%) of the annual judiciary budget. Fairness to the judiciary, and the protection of its quality and independence, would come at a very small cost in dollars.
 
 
 17
 This brief review of the recent history of judicial compensation policy highlights the wisdom of the founders in including in Article III the express provision for protection of judicial salaries. In the larger view, it behooves the Government to ensure that that protection has real meaning, since the judiciary's ability to function as an independent judiciary is a cornerstone of the people's freedom. Professor Katzmann, in his recent book, stated the point well:
 
 
 18
 This relationship [between the federal judiciary and Congress] shapes the administration of justice in critical ways. What is at issue in part is the integrity of political institutions: the judiciary needs to function in an environment respectful of its core values and mission, with the requisite resources; and the legislative branch seeks a judicial system that faithfully interprets its laws and efficiently discharges justice. But a goal even greater than the well-being of particular branches of government is at stake: the preservation of the means by which justice is dispensed fairly and efficiently.[7]
 
 2.
 
 19
 The Supreme Court has had several occasions to expound on the law of the Compensation Clause and on those occasions has established the following propositions. The imposition of a new federal tax that has the effect of reducing the judicial compensation of judges already in office is unconstitutional. See Evans v. Gore, 253 U.S. 245 (1920). However, an income tax levied against the judicial salary of judges who took office after the levy is in effect is constitutional, when the taxing measure is of general, non-discriminatory application to all earners of income. See O'Malley v. Woodrough, 307 U.S. 277 (1939). In addition, though Congress may not rescind a salary increase for judges once it has gone into effect - that would be a diminishment of compensation - Congress is under no constitutional obligation to grant salary increases. See United States v. Will, 449 U.S. 200 (1980); see also Atkins v. United States, 556 F.2d 1028 (Ct. Cl. 1977).
 
 
 20
 The question before us is one not yet presented to the Supreme Court, or previously to this court. We earlier held, consistent with Evans, and now law of this case, that the imposition in 1983 on federal judges then in office of entirely new taxes - the OASDI and HI taxes - is unconstitutional. The question before us now is, what is the remedy for this unconstitutional imposition, as a result of which these judges have had withheld from their judicial salaries sums of money to which they are lawfully entitled.
 
 
 21
 The theory of the Government led the trial court to declare that:
 
 
 22
 if Congress mandates that federal judges pay a certain amount in a new tax but, at the same time, gives those judges a salary increase in an amount equal to or greater than the amount of the tax, then any diminution within the meaning of the Compensation Clause is immediately cured. This is what occurred with respect to plaintiffs.
 
 
 23
 Hatter VI, 38 Fed. Cl. at 172. The Government's theory of the case, that the judges sustained little if any damages from this unconstitutional imposition because whatever losses they sustained were offset by later general salary increases, is fundamentally flawed.
 
 
 24
 The basic problem with the Government's theory is that it would create, with regard to judicial compensation, two different classes of judges. One class would be all judges who held office from and after 1983.[8] Those judges would be entitled the full benefit of congressionally-granted salary increases, such as they might be, awarded during their term of office. The other class would be all judges who held office prior to 1983 and continued in office for some time thereafter. These latter judges would not receive the Congressionally-granted salary increases which became effective after 1983, because a significant portion of the increases would be allocated to pay the damage award to which they are entitled as a result of the earlier unconstitutional imposition, a damage award owed them by the Government.
 
 
 25
 That is not an acceptable proposition. There is no basis on which the pre-1983 judges ought to be made to pay, from their own pockets and out of their own salaries, including generally-granted increases, the damages owed to them by the Government, when the judges who were not subject to the unconstitutional imposition are entitled to keep all of their salaries, including the increases the judiciary was awarded.[9] The unconstitutional imposition which resulted in dollars being taken from the pre-1983 judges, dollars which were then allocated by the Government to other uses, created a specific liability upon the Government to these judges. It would be inequitable to charge these judges with the duty to pay their own damages from their own salaries, out of salary increases that Congress thereafter granted to all judges, increases unrelated to that liability. It also would be destructive of the principle that "The Judges . . . shall . . . receive for their Services, a Compensation, which shall not be diminished during their Continuance in Office." U.S. Const., art. III, §1.
 
 
 26
 Congress's purpose in granting the increases received by judges in the years since 1983 is relevant to our inquiry. When the Constitutional Convention turned its attention to Article III and the issue of judicial compensation, the draftsmen first proposed that Congress would be precluded from either decreasing or increasing the compensation of judges. As the Supreme Court explained in Will, "Gouverneur Morris succeeded in striking the prohibition on increases; with others, he believed the Congress should be at liberty to raise salaries to meet such contingencies as inflation, a phenomenon known in that day as it is in ours." Will, 449 U.S. at 219.
 
 
 27
 In The Federalist No. 79, Alexander Hamilton explained the thinking behind this approach:
 
 
 28
 It will readily be understood, that the fluctuations in the value of money, and in the state of society, rendered a fixed rate of compensation [of judges] in the Constitution inadmissible. What might be extravagant to-day might in half a century become penurious and inadequate. It was therefore necessary to leave it to the discretion of the legislature to vary its provisions in conformity to the variations in circumstances; yet under such restrictions as to put it out of the power of that body to change the condition of the individual for the worse.
 
 
 29
 The Federalist No. 79, at 491-492 (Alexander Hamilton) (Clinton Rossiter ed., 1961).
 
 
 30
 The wisdom of our founding fathers is borne out by history; since 1969, the base date currently used by the judiciary, inflation has increased by 344% in the aggregate. In the general salary increases Congress has seen fit to grant the judiciary in the years since 1983, there is nothing to suggest that the congressional purpose was to make whole the losses sustained by the pre-1983 judges resulting from the unconstitutional imposition of the tax at issue in this case. On the contrary, everything in the record and the legislative history makes clear that these increases were in response to continued concerns expressed in Congress, within the judiciary itself, in the bar, as well as among segments of the informed public, concerns for the well-being and continued vitality of the federal judiciary if the slide in purchasing power resulting from continued and unadjusted-for inflation was not halted.[10]
 
 
 31
 That slide was as much a concern with regard to the pre-1983 judges who remained in service as it was with regard to those who came to the office later. To deprive the pre-1983 judges of the benefit of those increases by using them to offset the losses they incurred from the Government's earlier wrongful act would not only be unfair, but would be contrary to Congress's purpose in granting the increases. The only proper conclusion that can be reached on the facts before us is that these plaintiffs are entitled to the full measure of compensation for the damages they sustained by the wrong that was visited upon them, and that measure is independent of any generally awarded adjustment to judicial salaries.
 
 3.
 
 32
 The judgment of the trial court must be reversed, and the matter must be returned to that court for determination of damages consistent with this opinion. Because a remand is necessary, there remains a disputed issue that needs resolving regarding the application of the statute of limitations. The judges argue that this case involves what is known as a 'continuing wrong,' so that each year in which moneys are withheld by the Government, a new cause of action arises. By this theory, no judge whose salary was or is subject to the unconstitutional imposition is barred by the six-year statute of limitations applicable to suits in the Court of Federal Claims. See 28 U.S.C. § 2401(a) (1994) ("[E]very civil action commenced against the United States shall be time barred unless the complaint is filed within six years after the right of action first accrues.").
 
 
 33
 The Government responds that the continuing wrong doctrine is inapplicable to this type of case, and cites this court's opinion in Hart v. United States, 910 F.2d 815 (Fed. Cir. 1990). The Government also notes that the application of the continuing wrong theory would mean that no judge would be entitled to more than six years' worth of recovery, since any claim for years prior to that would be barred.
 
 
 34
 We agree with the Government that this is not the type of case in which the continuing wrong theory makes sense. See Brown Park Estates - Fairfield Dev. Co. v. United States, 127 F.3d 1449, 1456-59 (Fed. Cir. 1997). The cause of action arose when the statutes which established the unconstitutional imposition became effective. Some judges 'voluntarily' allowed the taxes to be taken from them year after year, in the sense that they did not protest the imposition in the only legally-effective way open to them, by a timely challenge in the courts. A judge who does not challenge the imposition by filing a complaint within the period allowed from the time the cause of action accrued is not protected from the defense of the running of the statute of limitations; like any litigant against the Government, such a plaintiff is subject to having the cause of action barred.
 
 
 35
 In this case, suit was brought not as a class action but on behalf of the individually named judges. In that regard, there are two causes of action arising under two different statutes. The Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. No. 97-248, imposed the Hospital Insurance portion of the Social Security tax on federal judges effective January 1, 1983. Since the pleadings in this case were filed on December 29, 1989, just short of seven years after the cause of action arose, all claims under that Act are subject to being barred by the running of the statute of limitations. The Old Age and Survivors Disability Insurance portion of the Social Security tax was imposed on federal judges by the Social Security Amendments of 1983, Pub. L. No. 98-21, and was effective January 1, 1984. Since this suit was filed by the original ten judges a few days short of six years from when that cause of action arose, the suit on that claim is not barred.
 
 
 36
 The rather convoluted accounting the trial judge found himself enmeshed in because of the theory of the case that was adopted in the trial court is wholly irrelevant; therefore we express no opinion thereon.
 
 CONCLUSION
 
 37
 The judgment of the Court of Federal Claims is reversed, and the matter remanded to that court for further proceedings consistent with this opinion.
 
 
 38
 REVERSED AND REMANDED.
 
 
 
 NOTES:
 
 
 [1]
 The history of this case involves the following six decisions: Hatter v. United States, 21 Cl. Ct. 786 (1990) (Hatter I), Hatter v. United States, 953 F.2d 626 (Fed. Cir. 1992) (Hatter II), Hatter v. United States, 31 Fed. Cl. 436 (1994) (Hatter III), Hatter v. United States, 64 F.3d 647 (Fed. Cir. 1995) (Hatter IV), Hatter v. United States, 117 S. Ct. 39 (1996) (Hatter V), and Hatter v. United States, 38 Fed. Cl. 166 (1997) (Hatter VI).
 
 
 [2]
 The absence of a quorum resulted from recusals, presumably by Justices who could be affected by the outcome of the case. The members of the panel of this court who decided the earlier appeals and who are participating in this decision were all appointed subsequent to the events, and thus are not affected by the outcome.
 
 
 [3]
 We follow the designation of the Court of Federal Claims, which referred to the plaintiffs filing the original complaint as the "original" judges and those who joined or rejoined (after not joining the appeal of Hatter I) the amended complaints as the "later-filing" judges.
 
 
 [4]
 The extent of the trivialization is illustrated by the damage award made by the trial court: the judges alleged that their out-of-pocket losses from the unconstitutional imposition varied between $20,000 to $56,000, with an average of about $47,000; the trial court's judgment awarded a total of $329 to the district judges and $348 to the appellate judge, plus interest.
 
 
 [5]
 See also United States v. Will, 449 U.S. 200 (1980); O'Malley v. Woodrough, 307 U.S. 277 (1939); Miles v. Graham, 268 U.S. 501 (1925).
 
 
 [6]
 Atkins v. U.S., 556 F.2d 1028 (Ct. Cl. 1977), was an unsuccessful attempt to force the Government to address the destructive effect of inflation on the judiciary during the period 1969 - 1975, when the value of the dollar, measured by the Consumer Price Index, decreased by 34%, and Congress failed to provide increases to protect judges' purchasing power.
 
 
 [7]
 Robert Katzmann, Courts and Congress 1 (Brookings Institution Press 1997).
 
 
 [8]
 For purposes of the discussion, we use the 1983 date as the significant cut-off. As will be seen in Part 3 of this opinion, for reasons related to the statute of limitations problem, that date may not be the controlling one.
 
 
 [9]
 Of course the later-appointed judges are subject to general tax levies in effect at the time of their appointment, see O'Malley v. Woodrough, 307 U.S. 277 (1939), but that is another matter entirely.
 
 
 [10]
 See Report of 1989 Commission on Executive, Legislative and Judicial Salaries: Hearings Before the Senate Committee on Governmental Affairs, 101st Cong., 1st. Sess., 130 (1989).