Per Davis, J.:
“ Executive officers are, properly, most careful to act within specific delegated powers given them by statute or regulations antecedent to action, and we have occasion constantly to see and commend the jealous regard these officers exhibit for the literal commands of the statutes, and their great care in the protection of the revenue.” (Crain v. United States, 25 C. Cls. R., 221.)
*283 The President himself can not control a statute nor dispense with its execution. (State of Mississippi v. Johnson, 4 Wall., 475; Kendall v. United States, 12 Pet., 525.)
“Even courts will not pronounce a law unconstitutional unless its opposition to the Constitution be clear and plain.” (Fletcher v. Peck, 6 Cr., 87, 128. Dartmouth College v. Woodward, 4 Wheat., 625.) (Livingston v. Moore, 7 Pet., 537; Falconer v. Campell, 2 McLean, 195.)
2. If there were no other grounds of defense in this suit, we would urge that the alleged award was invalid and void on the ground that the income taxon judicial salaries was levied by a law of Congress, which was binding on the executive branch of the Government until the judicial branch should authoritatively decide against its own liability to the tax.
(Ill) Judicial salaries are not exempt from fair and equal taxation.
The provisions of the eighty-eighth section of the Act of July 1, .1862, which first levied the income tax on salaries, were reenacted three times in substantially the same terms — except as to the rates of exemption and tax: once by the Thirty-eighth Congress (13 Stats., 285) and twice by the Thirty-ninth Congress (14 Stat., 138, 480). The levy included the salaries of all officials in the three departments of the Government — the legislative, the executive and the judiciary; yet during all the years, in which it was in force (1862 to 1870) no public protest or objection, based upon the Constitution, was made against its collection by any justice or judge, or by any official or employe of either department; and certainly no legal proceedings were had to test the constitutionality of the thrice-repeated legislation.
These Congresses passed no law reducing the fixed compensation of Senators or Eepresentatives, or diminishing the salaries of the President and the judges. The full amount of all compensation and salaries was regularly appropriated. The tax was calculated on the full amount of compensation so fixed by law. There was no other mode of calculating it; hence, prima facie, there was no diminution of salaries or compensation, and none in fact, unless sharing the common burden of taxation imposed for the defense and general welfare of all the people under the Government of the United States was a diminution. *284 If there be any exemption of a judicial salary from taxation it must apply as well to other indirect or direct or capitation taxes, because, when the whole income is a salary, the effect upon it of a tax is the same — its purchasing power is diminished under either form of taxation.
The purchasing power of judicial salaries was very much diminished in 1862-18G7 by the payment thereof in Treasury notes; but as that diminution was only a part of the common burden of the period, it was never supposed to be an unconstitutional payment to the judges. (Matter of N. O. Draining Company, 11 La. Ann.) (Philadelphia Association, etc., v. Wood, 39 Pa. St., 83.)
The power of Congress “ to lay and .collect taxes, duties, imposts, and excises” is coextensive with the territory of the United States. (Loughborough v. Blake, 5 Wheat., 317; The Cherokee Tobacco, 11 Wall., 616.)
This power, like all others vested in Congress, is complete in itself. It may be exercised to its utmost extent. It acknowledges no limitation other than those prescribed in the Constitution. (Gibbons v. Ogden, 9 Wheat., 199; Pacific Insurance Company v. Soulé, 7 Wall., 446.)
Congress may designate the subject of the tax, prescribe the basis for the rate, and the mode of payment, as it may deem proper, and “No power of supervision or control is lodged in either of the other departments of the Government.” (Pacific Insurance Company v. Soulé, 7 Wall., 443; Veazie Bank v. Fenno, 8 Wall., 533.)
The case of the Collector v. Day (11 Wall., 113) recognizes another limit on this taxing power, but it has no application to the question involved here.
No better illustration of the true intention of the United States constitutional safeguards set around the compensation of the President and the judges can anywhere be found than in Article xm of the constitution of the Commonwealth of Massachusetts.
To adopt its language, we would say that the intention was:
“To provide for 1 permanent and honorable salaries,’ so that these high officials ‘ should not have their attention necessarily diverted by their private concerns from acting with freedom for the benefit of the public;’ and so that they 1 should maintain the dignity of the United States in the character of Chief Magistrate and justices of the Supreme Court.’”
*285 Mr. Justice Bradley, in recording his dissent in the case of Collector v. Day, made the following language his text:
“ I dissent from the opinion of the court in the case because it seems to me that the General Government has the same power of taxing the income of officers of the State governments as it has of taxing that of its own officers.”
It did not enter into his mind that the income tax levied on his own salary was an attempt on the part of Congress to encroach upon the independence of the Federal judiciary. Every justice on the Supreme Bench was familiar with the history and object of the constitutional provision which declared that their compensation “ shall not be diminished during their continuance in officeand also with the views of the Supreme Court of Pennsylvania, expressed in the opinion delivered in the case of Commonwealth ex rel. Hepburn v. Mann (5 W. & S., 103), and the Supreme Court of Louisiana in the like case of New Orleans v. Lea (14 La. Ann., 197).
In these cases the principles stated rest upon the independence of the judiciary department, and the care which should be exercised to enable it to defend itself against encroachments upon its independence by the two other departments of the Government, especially the legislative.
In the Louisiana case the court decided that the city of New Orleans could not .tax the salary of a justice of the supreme court of the State, because of constitutional provisions construed according to the doctrine of Chief Justice Marshal in McCulloch v. Maryland, “ that the power to tax involves the power to destroy; ” which we submit can have no application to equal and general taxation clearly intended to support and not to destroy the Government. These State court opinions evince a nervous apprehensiveness in drawing the line between taxation and the independence of the judiciary.
The framers of our Constitution intended to maintain the independence of the judges by making their salaries secure from all improper legislation —from such legislation as might operate as an attempt to retard them in the administration of their high offices. In securing fixed judicial compensation it was not intended to exempt the judges from all civic duty, or from a fair share of the public burdens which are borne by all taxpayers.
*286 As to the personal protest of Chief Justice Taney, cited in the brief on the other side, which was addressed to the Secretary of the Treasury, we submit that it was not addressed to the proper department of the Government, and hence that it can have no weight here, especially as all the justices continuously thereafter submitted to the tax without taking any steps to have the constitutional question determined by appropriate legislation, or by a court of competent jurisdiction, at the suit of one of the justices or one of the circuit or district judges.
2. Any construction of the Constitution which would exempt judicial salaries from equal taxation would certainly also exempt them from the laws which made such salaries payable in Treasury notes, and with much stronger reason.
The law under which the tax was levied recognized that some incomes would be in coins and others in paper currency. (14 Stat. L., 147; Trebilcock v. Wilson et ux., 12 Wall., 687, 676; Lane County, Oregon (7 Wall., 71); Bronson v. Rodes (id., 229); The Emilie Souder (17 Wall., 666.)
Nor could it be shown that the law prohibited the payment of these salaries in coin, because, as said by Chief Justice Chase, delivering the opinion of the Supreme Court, at the December term, 1868, in Bronson v. Rodes:
“ It must be observed that the laws for the coinage of gold and silver have never been repealed or modified. They remain on the statute book in full force. And the emission of gold and silver coins from the mint continues, the actual coinage during the last fiscal year having exceeded, according to the report of the Director of the Mint, nineteen million dollars.
“Nor have the provision of law which make these coins a legal tender in all payments been repealed or modified.”
Whether th e payment of these salaries in paper money during the income-tax period actually diminished the compensation of the judges, as it had been ascertained by law on March 3,1855, can perhaps be discovered by the language of the same opinion in the opening paragraph:
“It is not pretended that any real payment or satisfaction of an obligation to pay fifteen hundred and seven coined dollars can be made by the tender of paper money [United States legal-tender notes] worth in the market only six hundred and seventy coined dollars.”
If paying judicial salaries in legal tender-notes of the current value of $2.25 to $1 in coin was not a violation of the con *287 stitutional provision which secures judicial compensation from being diminished, we fail to see how a general income tax of from 3 to 5 per cent, could be obnoxious to that provision.
(IY) As to the second phase of the case, looking at the matter as a demand for unpaid salary.
In this view of the case the First Auditor and First Comptroller, as accounting officers of the Treasury, had alone the power to receive and settle a claim for the unpaid salary. They were not at the time of the demand, nor are they now, embarrassed by kny statute of limitation in respect to such a claim.
(1) There may be a question as to whether these officers can lawfully state and certify an account for the unpaid part of a salary in the absence of a demand therefor by the creditor.
(2) But this is not the case at bar. The account was stated and certified by the Fifth Auditor and the First Comptroller of the Treasury for a sum of money admitted by them to be due, and payable from the appropriation for refunding iuternalrevenue taxes, and a warrant and draft were issued against that appropriation. If it should be contended that the account stated by the Fifth Auditor ought to be regarded as an adjustment for an unpaid balance of salary, we submit that such action was not within his statutory powers, because the First Auditor alone had j urisdiction to state a j udicial salary account. (Rev. Stat., 277.)
Without the preliminary action of the First Auditor the First Comptroller had no jurisdiction to certify a balance due and payable from a judiciary appropriation. Hence, if for the moment we regard the matter as an abortive settlement of a judge’s salary account, it is obvious that the draft and warrant granted for the payment of the balance found due were inadvertently issued, and that, as no money was actually paid out of the Treasury, the error has been corrected by covering back the money drawn by that warrant into the appropriation from which it had been erroneously taken. Hence, in fact, as well as in contemplation of law, no amount of any draft issued for an unpaid balance of decedent’s salary as a justice of the Supreme Court was ever carried to the credit of the payee into the “outstanding liability account” provided in sections 306 and 307 of the Revised Statutes.
^3) This, therefore, is not a case of prima facie liability arising upon an award, nor a case of prima facie liability arising on *288 the issue of a Treasury draft for the payment of a stated and certified salary account, nor a case arising on the refusal of the First Comptroller in the year 1888 to abide by the decision of his predecessor in office and to comply with the provisions of sections 306-308 of the Revised Statutes in respect to the amount represented by the unpaid draft.
On the contrary, it is a case resting upon impeached, unauthorized, and mistaken action on the part of the Commissioner of Internal Revenue, upon which no liability on the part of the defendant can be implied.
Richardson, Ch. J.,
delivered the opinion of the court: '
The claim in this case is founded on the following facts:
A draft had been issued by the Treasurer, in December, 1873, in favor of the claimant’s testator, for $1,128.97, and had been sent to the Commissioner of Internal Revenue, to be mailed to him. While there it was stolen, with other drafts, and has never since been heard from. After three years had expired, the draft remaining unpaid, the amount was deposited by the Treasurer, covered into the Treasury by warrant, and carried to the credit of the claimant’s testator in the appropriation account of u outstanding liabilities-” (Rev. Stat., § 306.)
So it remained until the early part of 1888, when the testator’s then executrix made a formal demand for the amount. On the 24th of April of that year the First Comptroller disallowed the claim, and recommended that the matter be referred to the First Auditor tor the statement of an account in the name of the payee of the draft, payable from outstanding liabilities and to be paid to the Treasurer for deposit to the credit of the appropriation “ for refunding taxes illegally collected ” on account of erroneous allowance made in favor of the payee of said draft. This was accordingly done.
The defendants set up several defenses. First, the statue of limitation. In our opinion this defense can not prevail. Money carried to the appropriation account of “ outstanding liabilities” is held in the nature of a trust fund awaiting demand of the parties to whose credit it stands. Revised Statutes, § 307, makes a permanent appropriation for the redemption and payment of all such outstanding and unpaid drafts, and § 308 provides for their payment when presented, without limit of time.
*289 In Waddell's Case (25 C. Cls. R., 323, 328) we held as to stale claims that “there is much indebtedness of the United States which no lapse of time in making application for payment renders stale, such as interest on registered bonds and other balances stated in favor of parties on the books of the Treasury Department, as to which the only proof to be made is the identity of the claimant or of his right to represent the record creditors.”
We now hold that the statute of limitation does not run against outstanding liabilities so entered in the books of the Treasury Department for which there is a permanent appropriation and other provisions by Revised Statutes, §§ 306, 307, 308, until the outstanding drafts, etc., are presented, or demand is made without the draft and its nonproduction is properly accounted for. The case can not be distinguished in principle from that of Taylor (104 U. S. R., 216) affirming the judgment of this court (14 C. Cls. R., 339).
The nonproduction of the draft is sufficiently accounted for by proof of its having been stolen more than seventeen years ago and never since heard from. In such a case it is not necessary to give a bond of indemnity, as is usual in suits on lost negotiable instruments, and the defendants have asked for none.
The statue of limitation does not run against a fund held in trust until the trustee disavows the trust. When, on demand by the claimant’s predecessor, in 1888, the Comptroller of that year not only refused payment, but, overruling the previous action of Ms predecessors of more than ten years’ standing, ordered the money tobe withdrawn from the account of outstanding liabilities and carried to another account, and that was done, this was a disavowal of the trust, and the statute might begin to run from that date, but not before. This suit was commenced within six years from that time.
Another defense is that the original allowance or award by the Commissioner of Internal Revenue was void, because the claim was not presented to him in a formal manner on a blank prescribed by the Secretary of the Treasury, within the time limited by the act (now Rev. Stat., § 3228).
The findings show that when, on the 7th June, 1873, the very next day after the limitation had expired, the Commissioner made his award conditionally on the approval of the Secretary *290 of tbe Treasury, he had before him a statemeut from the Comptroller, dated April 30,1872, which was more than a year within the statute period of limitatiou, and that he attached it to a regular printed blank. In the opinion of the court this was a sufficient presentation of the claim within the meaning of the statute and the regulations, accepted as it was by the Commissioner. Yalid claims can not be defeated by irregularities of the executive officers in mere matter of form. The printed blanks prescribed by the Secretary of the Treasury did not exactly and aptly apply to such a case as the one before the Commissioner, and he accepted the informal statement made out by the Comptroller as sufficient. The Secretary of the Treasury approved the allowance on that presentation of the claim, both accounting officers of the Treasury at that time passed it in the same way, and a warrant for its payment was drawn by the Secretary. This action on the part of four high executive officers, including the head of the Department, waived such informality and rendered the allowance valid.
Another defense is set up, that the application of the income tax to the salaries of Federal judges was not erroneous, and that the deductions from such salaries were not illegal. In view of the opinion of the Attorney-General in 1869 (13 Opin., 131) and of the protest of Chief Justice Taney, on file in the Supreme Court and read in the trial of the case, as well as the actual refund to all the judges except those in like condition of Mr. Justice Wayne, and the general acquiescence of the profession in that view of the law, we shall not at this late date enter upon the consideration of that question.
Judgment will be entered for claimant for the amount demanded in his petition.