**Judge Terry J. HATTER,
Jr., et al., Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

No. 705–89 C.

United States Court of Federal Claims.

June 22, 1994.

The parties agree that there are no material disputed facts. We conclude that defendant's cross-motion should be granted.

## I

Plaintiffs are federal district and circuit court judges who took office prior to January 1, 1983. On that date, all federal judges for the first time became subject to the Hospital Insurance (Medicare) portion of the Social Security tax. Tax Equity and Fiscal Responsibility Act, Pub.L. No. 97–248, § 278(a) 96 Stat. 324, 559 (1982) (codified as amended at 26 U.S.C. (I.R.C.) § 3121(u) (1988)). One year later, judges became subject to the Old Age Survivors and Disability Insurance portion of the Social Security tax, and since January 1, 1984, all federal judges have been fully subject to Social Security taxes. Social Security Amendments of 1983, Pub.L. No. 98–21, § 101(a)(1), (b)(1) and (d), 97 Stat. 65, 68, 69 (codified as amended at 26 U.S.C. (I.R.C.) § 3121(b)(5)(E) (1988) and 42 U.S.C. § 410(a)(5)(E) (1988)). Social Security taxes have therefore been duly withheld from plaintiffs' monthly compensation since the effective dates of these acts.

Plaintiffs all serve pursuant to Article III of the Constitution, which in pertinent part provides that federal judges "shall, at stated Times, receive for their Services, a Compensation, which shall not be diminished during their Continuance in Office." U.S. Const. art. III, § 1 (hereafter the "Compensation Clause").

Steven S. Rosenthal, with whom were W. Stephen Smith, Ellen E. Deason and Eric N. Richardson, Washington, DC, for plaintiffs.

Jeanne E. Davidson, with whom were Asst. Atty. Gen., Frank W. Hunger and David M. Cohen, Washington, DC, for defendant.

### OPINION and ORDER

TURNER, Judge.

This opinion addresses plaintiffs' motion for summary judgment filed September 2, 1993 and defendant's cross-motion for summary judgment filed October 1, 1993. Oral argument was heard on November 16, 1993.

Plaintiffs contend that because they were already judges when the withholding of Social Security taxes from their pay began, their compensation was diminished in violation of the Compensation Clause. In the alternative, plaintiffs claim a contract right to undiminished compensation. Plaintiffs seek a refund of all Social Security taxes collected thus far.

After a review of Compensation Clause law in part II, we consider plaintiffs' four main constitutional arguments in part III, and then address plaintiffs' contract claim in part IV.

## II

### A

An income tax on judges was first imposed in 1862 and was collected for several years. Act of July 1, 1862, ch. 119, § 86, 12 Stat. 432, 472 (1862). This law occasioned the Supreme Court's first pronouncement on the constitutionality of taxing judges. It came as an extraordinary 1863 protest against the tax issued in the form of a letter from Chief Justice Taney to the Treasury Secretary. This remarkable document, officially recorded and published by the Court[1] and resembling nothing so much as an unsolicited advisory opinion, was echoed several years later by an opinion from the Attorney General that the income tax was unconstitutional as applied to judges. 13 Op.A.G. 161 (1869). As a consequence, all taxes which had been collected on judicial compensation were refunded in 1873. *Wayne v. United States,* 26 Ct.Cl. 274, 290, 1800 WL 1765 (1891). But these two seemingly non-binding opinions had an even more powerful effect: the courts came to consider the matter of judicial taxation closed without ever actually addressing the issue. *E.g., Wayne,* 26 Ct.Cl. at 290.

The courts finally addressed the matter when, subsequent to ratification of the 16th Amendment in 1913,[2] Congress in 1919 made its second serious attempt to tax federal judges. Revenue Act of 1918, ch. 18, § 213, 40 Stat. 1057, 1065 (1919). Thus the first Compensation Clause case of precedential significance does not appear until *Evans v. Gore,* 253 U.S. 245, 40 S.Ct. 550, 64 L.Ed. 887 (1920). In *Evans,* a federal judge who had taken office in 1899 challenged the Revenue Act of 1918, arguing that the income tax was an unconstitutional diminution of his salary.

Over a vigorous dissent by Justice Holmes, joined by Justice Brandeis, the Court agreed with the plaintiff judge, holding that an income tax on judges was an impermissible diminution in compensation, and that the Compensation Clause continued to prohibit taxation of judicial salaries even after the 16th Amendment. Holmes's position in dissent, since adopted by the Court as will be seen, was that an income tax on judges would be valid so long as it did not single out judicial compensation but rather applied with like force to the income of all citizens. 253 U.S. at 264–67, 40 S.Ct. at 557–58.

The taxing authorities refused to give in so easily. In *Miles v. Graham,* 268 U.S. 501, 45 S.Ct. 601, 69 L.Ed. 1067 (1925), the government sought to limit the *Evans* rule, arguing that the tax protection of the Compensation Clause shielded only judges appointed before the tax became law (hereafter "prior judges").[3] According to the government, prior judges stood in contrast to judges taking office after the tax (hereafter "new judges"): taxation would not diminish the compensation of new judges, since they would never have received their salary untaxed. In *Miles,* the plaintiff was a new judge who argued, in essence, that the Compensation Clause's protection extended to judicial compensation as an entity or institution, without regard to whether the recipient judge took office before or after enactment of the tax.

The Court in *Miles* agreed with the plaintiff, firmly rejecting the government's attempt to limit the *Evans* tax exemption to prior judges. (Brandeis, but not Holmes, dissented without comment.) Relying heavily on *Evans, Miles* made explicit the simple rule inferable from *Evans:* under the constitution, all judicial compensation provided for by Congress was tax-free. 268 U.S. at 509, 45 S.Ct. at 602.

In a familiar pattern, it was not long before the initially rejected Holmes–Brandeis formulation (calling for judicial salary to be treated the same for tax purposes as income earned by any citizen) was, in effect, adopted by the Court. This development came after Congress in 1932 made its third attempt to

---

1. The letter is found at 157 U.S. 701. There was a 32–year lapse between the 1863 order of the Court recording the letter and its publication.

2. "The Congress shall have power to lay and collect taxes on incomes, *from whatever source derived,* without apportionment among the several states, and without regard to any census or enumeration." U.S. Const. amend. XVI (emphasis added).

3. Plaintiffs here are all prior judges, since they took office before the Social Security tax extended to the judiciary.

tax the judiciary, imposing another income tax limited to new judges. Revenue Act of 1932, ch. 209, § 22(a), 47 Stat. 169, 178 (1932). Predictably, a new judge challenged this tax based on the rule of *Miles*. *O'Malley v. Woodrough*, 307 U.S. 277, 59 S.Ct. 838, 83 L.Ed. 1289 (1939) (Frankfurter, J.).

For the tax collectors, the third time proved the charm: the Court reversed course, issuing its first rejection of a judge's Compensation Clause challenge to a tax. The Court held that judicial compensation could be taxed, approving Congress's "position that a non-discriminatory tax laid generally on net income is not ... a diminution [of a federal judge's] salary within the prohibition" of the Compensation Clause. 307 U.S. at 282, 59 S.Ct. at 840. According to the Court, the constitution did not excuse judges from the obligations of citizenship. *Id.* *O'Malley* left *Miles* effectively overruled.[4]

Justice Frankfurter in *O'Malley* also sharply criticized *Evans*, but in a characteristic exercise of judicial restraint was careful to note that only the question of tax immunity for *new* judges was properly at bar, whereas the plaintiff in *Evans* had been a prior judge. *O'Malley*, 307 U.S. at 281–82, 59 S.Ct. at 839–40. As will be seen, *O'Malley* remains the most important precedent in the area of taxation of federal judges.

■ A generation after *O'Malley*, the Court of Claims[5] thoroughly reviewed Compensation Clause law in *Atkins v. United States*, 214 Ct.Cl. 186, 556 F.2d 1028 (1977) (en banc), *cert. denied*, 434 U.S. 1009, 98 S.Ct. 718, 54 L.Ed.2d 751 (1978). This review was occasioned by the suit of a group of federal judges who claimed that their compensation, though nominally unchanged since 1969, had in fact been unconstitutionally

eroded by inflation. In rejecting this claim, the Court of Claims gave valuable guidance on the import of *O'Malley* and its predecessors.

In analyzing the Supreme Court's holding in *O'Malley*, the Court of Claims in *Atkins* stated that both *Evans* and *Miles* are "no longer good law," *id.*, 214 Ct.Cl. at 213, 556 F.2d at 1043. According to the Court of Claims, *O'Malley* "overruled *Miles*, and by force of reasoning overruled a good deal of *Evans*," *id.* at 215, 556 F.2d at 1044.[6]

■ *Atkins* fleshes out the distinction between indirect and direct diminution first alluded to by the Supreme Court in *Evans*, 253 U.S. at 254, 40 S.Ct. at 553. A direct diminution is a reduction in the number of dollars authorized by Congress for a judge's salary, while an indirect reduction, for instance "by virtue of a tax," lowers the take-home pay of a judge but not the statutory salary. *Atkins*, 214 Ct.Cl. at 215, 556 F.2d at 1044. Given that "the purpose of the Compensation Clause is to preclude a financially based attack on judicial independence," *id.* at 222, 556 F.2d at 1048, cases of indirect diminution are to be handled differently from cases of direct diminution. The Court of Claims explained that while the Supreme Court's Compensation Clause cases uniformly agreed that direct diminutions were always prohibited, after *O'Malley* "[i]ndirect, nondiscriminatory diminishments [like taxes] ... which do not amount to an assault on the independence of the third branch ... [are not prohibited by] the Compensation Clause," *id.* at 216, 556 F.2d at 1045.

The 1977 *Atkins* decision is in full accord with the later Supreme Court Compensation Clause case of *United States v. Will*, 449 U.S. 200, 101 S.Ct. 471, 66 L.Ed.2d 392 (1980),

---

4. The court's language is to some degree unclear as to the fate of *Miles*: "But to the extent that what the Court now says is inconsistent with what was said in *Miles v. Graham*, 268 U.S. 501, 45 S.Ct. 601, the latter cannot survive." 307 U.S. at 282–83, 59 S.Ct. at 840.

5. In 1982 the Court of Claims and the Court of Customs and Patent Appeals were abolished. Judges of those two courts became judges on the new Court of Appeals for the Federal Circuit. *See* Federal Courts Improvement Act of 1982, Pub.L. No. 97–164, tit. I, § 165, 96 Stat. 25, 50

(1982) (codified as amended at 28 U.S.C. § 44 (1988)). Court of Claims decisions constitute precedent for this court to the same extent as decisions of the Federal Circuit. *South Corp. v. United States*, 690 F.2d 1368 (Fed.Cir.1982).

6. Also interesting in this regard is Justice Butler's dissent in *O'Malley* itself, which states that the majority in *O'Malley* "intend[ed] to destroy the decision in *Evans v. Gore*." 307 U.S. at 297, 59 S.Ct. at 846.

which dealt with a direct diminution. In *Will,* scheduled increases in judicial, congressional, and top-level executive pay were withdrawn for four years running, twice just before the raises took hold, and twice just after. Upon a suit by federal judges, the Court held that while the political branches may cancel a prospective judicial salary increase, any increase allowed to become effective even for less than a day is permanent for Article III judges. 449 U.S. at 224–26, 101 S.Ct. at 485–86.

The *Will* decision buttresses the implication of the Court of Claims in *Atkins* that all direct reductions of judicial compensation are invalid regardless of congressional intent: speaking of direct diminutions, the Court said "the Constitution makes no exceptions for 'nondiscriminatory' reductions." 449 U.S. at 226, 101 S.Ct. at 486. As to indirect diminutions, not at issue in *Will,* the Court was not quite so clear. Still, *Will* gives some guidance on indirect diminutions like taxes: the Court discussed *O'Malley* with apparent approval, noting that *O'Malley* validated income taxation of judicial salaries and "recognized that the Compensation Clause does not forbid everything that might adversely affect [the finances of] judges." *Id.* at 227 n. 31, 101 S.Ct. at 486 n. 31. In fact, *Will* may have left open the possibility that even a congressional intent to pressure the judiciary might not invalidate an indirect diminution: "[w]e need not address the question of whether evidence of an intent to influence

the Judiciary would invalidate a statute that on its face does not directly reduce judicial compensation." *Id.* at 226 n. 30, 101 S.Ct. at 486 n. 30.[7] Of course, in the absence of facts showing bad legislative intent, this legal question is moot. *Atkins,* 214 Ct.Cl. at 216, 228, 235, 556 F.2d at 1045, 1051, 1055.

### B

■ The following two rules and one corollary emerge from the foregoing review of the Compensation Clause case law.[8] First, direct diminution of the salary authorized for federal judges is absolutely forbidden, no matter how innocent the intent of Congress is. Second, so-called indirect diminishments, and specifically income taxes, are permissible even if they result in a reduction in take-home pay for federal judges, *at least* so long as they are not part of an assault on judicial independence. This rule's corollary is that if there is no evidence of legislative intent to influence the judiciary, taxes of general applicability are valid as to Article III judges.

Thus the question in this case is not whether the plaintiffs' compensation has been reduced by Social Security taxes, for at least in terms of take-home pay it has been, but rather whether this indirect reduction is of the type forbidden by the Compensation Clause.[9] As will be shown below, under *O'Malley* and subsequent cases, the answer is no.

7. The Court of Claims, albeit also in *dicta,* took a firmer stand on this issue, indicating that an indirect diminution which discriminated against judges would be remediable by the courts. *Atkins,* 214 Ct.Cl. at 222–23, 556 F.2d at 1048.

8. *Atkins* as it applies to this case is primarily *dicta,* since *Atkins* dealt with the impact of inflation on judicial buying power rather than with an impact caused by congressional action. *Will* is likewise not on all fours here, dealing as it does with a direct diminution rather than a tax. *O'Malley,* however, is almost directly on point, with the only arguable distinction being that it does not overtly deal with the problem of taxation of prior judges. Still, as we demonstrate, the *dicta* from *Atkins* and *Will,* read together with the all-important holding in *O'Malley,* form a consistent and common-sensical body of law governing the instant case.

9. For the purpose of resolving the motions at bar, we accept plaintiffs' assumption that inclu-

sion in Social Security represents a reduction in judicial pay. But this proposition is by no means settled. If plaintiffs were to prevail in this litigation, and all affected judges were effectively taken out of Social Security and refunded their Social Security taxes, Compensation Clause claims by judges who felt their compensation had been decreased would surely result. For instance, though plaintiffs here claim Social Security coverage *reduces* their compensation, in *Robinson v. Sullivan,* 905 F.2d 1199 (8th Cir.1990) (Wollman, J.), a senior judge who was retroactively denied Social Security credit for service during a brief window of Social Security coverage for senior judges challenged the denial as a Compensation Clause diminution. This argument was rejected on the grounds that his temporary coverage under Social Security was "not a direct *increase*" in compensation. 905 F.2d at 1202 (emphasis added).

### III

As to the Compensation Clause claims, (Second Am.Cplt. Counts I–II at 7–8), four basic themes, some of them related, emerge from plaintiffs' briefs and oral argument. First, plaintiffs contend that in overruling *Miles* but not *Evans*, the Supreme Court meant to limit the original broad holding of *Evans* to the following still vital rule: "[E]ven a tax of general applicability cannot be imposed upon [prior] judges who were appointed ... before the tax became law." Pl.Br. at 29. To some extent linked with this reading of *Evans* is plaintiffs' second contention that no taxation of judges is permissible if it makes judicial service relatively less attractive than it was when a judge took office. Pl.Br. at 20–21; Pl. Reply at 12–13. Plaintiffs' third argument is that the Social Security tax at issue here is not even an income tax of general applicability such as was permitted to be laid on judges by *O'Malley*. Pl.Br. at 25–26; Pl. Reply at 25–26; Tr. 15–16. Somewhat related to this argument is plaintiffs' last main point: that the scheme designed to bring federal employees under Social Security coverage discriminated against the plaintiff judges compared to other federal workers. Pl.Br. at 37–8, 40, 43; Tr. at 16–17, 19, 72–74. We discuss these four themes in turn.

### A

Plaintiffs' first contention is that the factually similar *Evans* case (discussed above in part II A) controls here, and thus that new taxes cannot be imposed on prior judges even if all other citizens are included in the new tax. Pl.Br. at 28–29. While it is true that the Supreme Court has never expressly overruled *Evans*, subsequent Court of Claims and Supreme Court cases convince us it would be irresponsible to dispose of this controversy on that ground. The Supreme Court itself long ago criticized the *Evans* case, *O'Malley*, 307 U.S. at 280–82, 59 S.Ct. at 839–40 (1939), and more recently confirmed that *Evans* has been "undermine[d]," *Will*, 449 U.S. at 227 n. 31, 101 S.Ct. at 486 n. 31. Additionally in *Will*, the Supreme Court

reversed a trial judge who expressly relied on *Evans*, albeit in a factually distinguishable case. *Will*, 449 U.S. at 227, 101 S.Ct. at 486–87.

Such negative Supreme Court guidance certainly discourages automatic reliance on *Evans*. But in addition, the *Will* and *O'Malley* decisions at the very least strongly suggest that a tax or other statute which indirectly reduces judicial pay is permissible absent evidence of a congressional intent to influence the judiciary. *Will*, 449 U.S. at 226–27 & nn. 30–31, 101 S.Ct. at 486–87 & nn. 30–31; *O'Malley*, 307 U.S. at 282, 59 S.Ct. at 840. Moreover, the Court of Claims stated that the Supreme Court has effectively overruled *Evans* "*at least* as regards [new] judges," *Atkins*, 214 Ct.Cl. at 215, 556 F.2d at 1044 (emphasis added).

Even in the face of this negative treatment, plaintiffs persist in their claim that though the broad rationale of *Evans* has certainly been narrowed by subsequent case law, the fact that *Evans* has never been expressly overruled means that some part of the holding survives. Pl.Br. at 28. According to plaintiffs, the surviving rule of *Evans* is that under the Compensation Clause, prior judges have more tax protection than new judges: you can't charge a prior judge new taxes. Pl.Br. at 28–29. Adopting this distinction between new and prior judges would require us to read much into *Evans*, because that case nowhere suggested such a difference. In fact the Court in *Evans* broadly defined the issue in that case as the taxability of the "compensation of federal judges *in general*," 253 U.S. at 247, 40 S.Ct. at 551 (emphasis added). We understand that the distinction between prior and new judges was arguably drawn by omission in *O'Malley* when the Court expressly limited its holding to new judges. 307 U.S. at 281–82, 59 S.Ct. at 839–40. But unlike the Court in *O'Malley*, here we are squarely addressed with the question of whether new judges have less tax protection than prior ones under the constitution. *O'Malley's* failure to expressly address the propriety of new taxes on prior judges is typical of the judicial restraint that

Justice Frankfurter was known for, and is not a ruling against such taxation.[10]

Only the quite proper use of judicial restraint in *O'Malley* and later in *Will* prevented the Supreme Court from overruling *Evans*. Now that the question of whether prior judges should be afforded more Compensation Clause protection than new judges is at bar for the first time since the discredited *Miles* decision, reaching back to the 1920 *Evans* case to resolve the question in plaintiffs' favor would require us to willfully ignore the intervening, and uniformly critical, case history. This we decline to do, although because this history developed in factually distinguishable situations, the question in a narrow technical sense will arguably remain open until the Supreme Court addresses the point. As discussed above, the more recent Supreme Court and Court of Claims cases on the Compensation Clause counsel reliance on the dissenting view of Holmes in *Evans* rather than on the majority.[11] Therefore, we hold that judicial salary, like other components of a judge's income, is taxable. *Will*, 449 U.S. at 227 n. 31, 101 S.Ct. at 486 n. 31 (citing with approval *O'Malley*, 307 U.S. 277, 59 S.Ct. 838 (1939)); *Evans*, 253 U.S. at 265–66, 40 S.Ct. at 557 (Holmes, J., dissenting); *Atkins*, 214 Ct.Cl. at 216, 556 F.2d at 1044–45.

**B**

Given that we decline to rely on *Evans*, plaintiffs, in the alternative, claim that the statutes in question violate the Compensation Clause by wiping out a tax advantage prior judges enjoyed relative to other citizens, a situation plaintiffs contend to be different from that presented in *Evans*. Plaintiffs argue that in *Evans*, a new tax was imposed on both judges and other citizens "at the same time;"[12] in contrast, plaintiffs here were subjected to the extension of an old tax they had escaped by becoming judges, thereby unconstitutionally costing sitting judges an advantage they held relative to non-judges. Pl. Reply 16 n. 7. As we will show, plaintiffs' attempt to distinguish their case from *Evans* fails.

**1**

■ Plaintiffs argue that to be valid, any new tax on prior judges must be simultaneous with taxation of the public. Pl. Reply at 16 n. 7; Tr. at 9–10. This is so because as long as an identical burden is simultaneously laid on the public and the judiciary, not even prior judges have suffered a diminution relative to other citizens[13] and so their judicial independence is not potentially threatened. Tr. at 9–10; *see* Pl.Br. at 16, 35–37; Pl. Reply at 19, 21. On the other hand, reason plaintiffs, the taking away of a tax exemption or other advantage held by prior judges rela-

---

10. *See Jefferson County v. Acker*, 850 F.Supp. 1536, 1548 (N.D.Ala.1994) (indicating in *dicta* that new judges would be entitled to the same Compensation Clause protection as the prior judges who were plaintiffs in the case).

11. Plaintiffs agree that the Court of Claims in *Atkins* read the Supreme Court decision in *O'Malley* to adopt Holmes's dissent in *Evans*. Pl.Br. at 33. (A district judge evaluating *O'Malley* recently came to the same conclusion. *Acker*, 850 F.Supp. at 1546.) Though plaintiffs argue that the *Atkins* and Holmes rule allowing judicial salaries to be taxed is incompatible with the *Will* approach banning any diminution in gross judicial pay, Tr. at 70–71, we disagree. As we explained above in part II A, in actuality *Atkins* and *Will* are complementary because they deal with different facts. *Will* expressed the absolute Compensation Clause protection which exists when judicial pay is directly diminished, while the more flexible rule developed in *Atkins* indicates that in cases of indirect, take-home pay diminu-

tion like taxation, an inquiry into congressional intent is needed.

12. Pl.Reply at 16 n. 7. It is unclear what plaintiffs mean by "at the same time." While it certainly is true that the Revenue Act of 1918 (which was at issue in *Evans*) did for the first time tax the income of judges, § 213, 40 Stat. at 1065, it is also true that the Revenue Acts of 1916 and 1917 had already imposed broad-ranging income taxes, although exempting judges already in office, ch. 463, § 4, 39 Stat. 756, 759 (1916); ch. 63, § 1200, 40 Stat. 300, 329 (1917). Thus, the income tax was imposed on the public years before judges were included. Only by artificially viewing each successive year's income tax statute in isolation can it be said that the Revenue Act of 1918 imposed a tax on the public and on judges "at the same time." But for purposes of this discussion only, we accept plaintiffs' characterization.

13. Hereafter, we may refer to this as the "simultaneity requirement."

tive to other citizens does potentially threaten judicial independence because it singles out judges.[14] *See* Pl.Br. at 20–21, 34; Pl. Reply at 16 n. 7, 19.

Looking past the terms of plaintiffs' seemingly novel relativity argument to its substance, it appears plaintiffs' position at bottom is nothing more remarkable than that a new tax laid wholesale on prior judges and the public is not discriminatory.[15] While this may be true, it provides no support for plaintiffs' further implication that a tax placed on the public and only later extended piecemeal to prior judges automatically violates the Compensation Clause as a potential threat to the independence of prior judges.

 Plaintiffs have pointed to no good reason why Congress in taxing judges has the power to accomplish wholesale what it cannot do piecemeal. *See, e.g.,* Pl.Br. at 34; Pl. Reply at 2–3, 9–10, 12–13, 16 n. 7. Plaintiffs equate comparative tax advantages enjoyed by judges with direct increases in judicial pay, arguing that both should at inception be permanent for judges then in office. Pl.Br. at 30–31, 34; Tr. at 8–9. But the purpose of the Compensation Clause is not to make irrevocable every momentary tax exemption enjoyed by sitting judges relative to the public; its purpose is rather to protect the independence of the judicial branch by insuring that judges are shielded from attempts by the political branches to impose economic duress. *O'Malley,* 307 U.S. at 282, 59 S.Ct. at 840; *Evans,* 253 U.S. at 265–67, 40 S.Ct. at 557–58 (Holmes, J., dissenting); *see Atkins,* 214 Ct.Cl. at 223, 556 F.2d at 1048–49. This underlying purpose leads to the simple rule of thumb which governs this case: in general, if judges are treated like other citizens by the tax laws, no threat to

judicial independence arises, and so the Compensation Clause is not implicated. Congress always has the power to place judges in tax parity with other citizens.

### 2

 Plaintiffs profess not to rely on *Evans* in deriving the simultaneity requirement for the taxation of prior judges. But plaintiffs' simultaneity requirement leads inescapably to the conclusion that the Compensation Clause provides the class of prior judges more tax protection than it does to new judges. This is the very conclusion that we rejected in refusing to rely on *Evans* above in part A. The new packaging does not yield a different result. Barring some sort of targeted discrimination, the finances of one individual judge or even a class of judges is not the concern of the Compensation Clause.[16] There is no requirement that prior judges be treated any differently from new judges for tax purposes: a judge escapes neither the present nor the future obligations of citizenship by taking the oath of office.

### C

Plaintiffs go on to claim that even with the above arguments conceded Social Security is not a tax of general applicability like the one which was held proper as to judges in *O'Malley.* Pl. Reply at 24–25; Tr. at 15–16, 72–73. In this vein, plaintiffs first contend that Social Security is not an income tax, but is rather a contributory public benefit plan. *E.g.* Pl.Br. at 26–27. In addition, plaintiffs maintain that Social Security taxes are not a truly general obligation of citizenship because the plan is not universal. *Id.;* Tr. at 72–73.

---

**14.** Hereafter, we may refer to this as plaintiffs' "relativity" argument or analysis.

**15.** Plaintiffs posit a scenario (first rhetorically raised in *Atkins,* 214 Ct.Cl. at 223, 556 F.2d at 1048) in which an enormous tax is laid across the land and then all other federal workers or citizens except judges get a raise or some other kind of relief. Pl.Br. at 36 n. 22. Suffice it to say that we do not here prejudge such a case.

**16.** The proper constitutional focus is on the interaction between the branches of government,

not on the appointment dates of individual judges. (It might be said that plaintiffs' analysis neglects the constitutional dimension of this case in favor of the astronomical.) The Compensation Clause is "not a private grant of privilege [to judges] but a limitation intended to benefit the public at large," *Atkins,* 214 Ct.Cl. at 223, 556 F.2d at 1049. The same idea is expressed in *Will,* 449 U.S. at 217, 101 S.Ct. at 481–82 and *O'Donoghue v. United States,* 289 U.S. 516, 533, 53 S.Ct. 740, 744, 77 L.Ed. 1356 (1933).

### 1

A close reading of plaintiffs' arguments shows that they do not seriously contend that Social Security is a contractual benefit plan rather than an income tax. In fact, plaintiffs themselves note that Social Security benefits are by no means guaranteed, and that the Congress could limit or cancel benefits under the program. Tr. at 10–11 (citing *Bowen v. Public Agencies Opposed to Soc. Secur. Entrapment*, 477 U.S. 41, 51–52, 106 S.Ct. 2390, 2396–97, 91 L.Ed.2d 35 (1986)). We agree. Of course, the taking of money by the federal government with no specific return obligation is typical of tax schemes, including income taxes. And, in fact, Social Security has long been treated as an income tax by courts. *Helvering v. Davis*, 301 U.S. 619, 634–35, 57 S.Ct. 904, 905–06, 81 L.Ed. 1307 (1937). It is plain that Social Security imposes an income tax.

### 2

At the heart of plaintiffs' argument that Social Security is not a tax of general applicability is the contention that the Social Security income tax is not sufficiently widespread. *See* Pl.Br. at 26, 36–37; Tr. at 72. We disagree. Social Security is a tax of general applicability, and so can be applied to federal judges. The parties have stipulated to the following facts: during 1984, the percentage of the paid civilian labor force covered by Social Security climbed from 91 percent to 93 percent, Jt.Stip. ¶ 18 (Appendix C to Pl.Br.), even while the paid civilian labor force increased from 102.2 million workers to 105.5 million, Jt.Stip. ¶ 27 (Table 4).

This amounts to effectively universal coverage of the nation's work force.[17] Given the web of exemptions and deductions allowed by Congress in virtually all areas of taxation, it is doubtful if any federal tax is of general applicability in the sense of applying to 100 percent of the possible taxpayers. We do not need to decide the boundaries of the term "a tax of general applicability" today. It is enough to say that the Social Security income tax, which at all times relevant to this litigation covered over 90 percent of paid

civilian workers, is a tax of general applicability like that held valid as to judges by the Supreme Court in *O'Malley*.

### D

Plaintiffs' last main Compensation Clause contention, somewhat linked to the idea that Social Security is not a tax of general applicability, is that the plaintiff judges were discriminated against as compared to the other federal employees affected by the same Social Security amendments. Pl.Br. at 37–38, 40, 43; Pl. Reply at 24; Tr. at 12, 15–17, 19, 22–23, 72–74. Plaintiffs contend that a Compensation Clause violation arises because judges, unlike all other federal employees, faced a mandatory reduction in take-home pay. Pl.Br. at 40, 43; Tr. at 74–75.

### 1

However, using federal employees instead of the general public as the Compensation Clause benchmark to determine the validity of a tax does not help plaintiffs in this case, since for purposes of this discussion the two groups have historically been treated alike.

Most federal employees have long been required to contribute to retirement plans in order to obtain retirement benefits. *See* 5 U.S.C. §§ 8331–48 (1988). This does not apply to Article III judges, whose basic retirement plan is free, and provides for lifetime full pay when certain age and length of service requirements are met. 28 U.S.C. § 371 (1988). By the acts challenged here, Congress expanded Social Security to cover most federal positions, including Article III judgeships, for the first time. Jt.Stip. ¶ 20. Speaking generally, Congress reduced or offset the contribution federal employees were required to make to their retirement plan by the amount of any newly required Social Security tax. Pl. Proposed Findings of Uncontroverted Fact ¶ 11 ("PPUF"). The retirement plan benefits of federal employees were correspondingly reduced to account for any newly expected Social Security benefits. *E.g.*, Federal Employees' Retirement Contribution Temporary Adjustment Act of 1983,

---

**17.** In September 1983, there were over 2.7 million federal employees. Jt.Stip. ¶ 19.

Pub.L. 98–168, § 206(c)(2), 97 Stat. 1106, 1109–10 (1983) (codified as amended in a note after 5 U.S.C. § 8331 (1988)). The net result of inclusion in Social Security for most federal workers thus was no change in take-home pay or benefits. It is plainly the view of Congress that the Social Security tax is fungible with the other retirement payments required of federal employees. Thus, both before and after the acts in question, almost all non-judicial federal employees, like over 90 percent of the nation's civilian workers, paid Social Security taxes or a mandatory equivalent.

Judges, with no retirement plan contributions to offset, were unique among federal employees in seeing their take-home pay necessarily decrease by the amount of the Social Security tax. PPUF ¶ 12. But this happened only because judges, unlike other federal employees and citizens, were never before required to pay into Social Security or a retirement plan equivalent to Social Security. There is no reason that tax burdens equivalent to those long required of other federal employees and working citizens cannot be extended to judges. *See supra*, part B(1). Here, the central Compensation Clause taxation rule has not been violated: judges are being treated no worse than other federal employees and citizens.

2

■ Even if we were to assume that the Social Security taxes at issue here did hurt judges compared to other federal workers, plaintiffs' Compensation Clause claim would not succeed. This is because in cases of indirect reduction in judicial compensation, it is an open question whether evidence of Congressional intent to pressure the judiciary would be enough to invalidate a statute. *Will*, 449 U.S. at 226 n. 30, 101 S.Ct. at 486 n. 30. At any rate, without evidence of such an intent this legal question is moot. *Atkins*, 214 Ct.Cl. at 216, 228, 235, 556 F.2d at 1045, 1051, 1055.

In this case, there is absolutely no evidence of an intent to influence the judiciary. This conclusion is not disputed by plaintiffs, Pl.Br. at 21–22; *see* Pl. Reply at 2; rather, plaintiffs' by-now familiar argument is that any reduction in take-home pay should be handled like a direct reduction in salary, that is to say it is prohibited by the Compensation Clause regardless of congressional intent. Pl.Br. at 21–23; Pl. Reply at 2, 10, 12; Tr. at 69, 71–72.

■ As indicated above, plaintiffs' conclusion ignores two related rules of Compensation Clause jurisprudence. First, in case of an indirect diminution of judicial compensation, it is *at least* arguable that judges seeking relief under the Compensation Clause for an indirect reduction in pay must show not just a discriminatory effect but an intent to influence the judiciary. *See Will*, 449 U.S. at 226 n. 30, 101 S.Ct. at 486 n. 30; *Atkins*, 214 Ct.Cl. at 233, 556 F.2d at 1054. Second and more important to the instant case, it is clear that if the indirect diminution is due to a tax of general applicability and the possibility of discriminatory legislative intent has been ruled out, the tax is valid under the Compensation Clause. *O'Malley*, 307 U.S. at 282, 59 S.Ct. at 840; *Atkins*, 214 Ct.Cl. at 216, 556 F.2d at 1044–45. That is the case here.

IV

■ Plaintiffs claim that if their constitutional argument fails, they still may be able to prevail on a contract theory. Second Am. Cplt. Count III at 8–9. Defendant has moved for summary judgment on the contract claim, maintaining that judges serve pursuant to appointment, not contract. Def. Br. at 38–41.

Plaintiffs are unable to cite any convincing authority for the proposition that judges are contract employees. *See, e.g.,* Pl. Reply at 27–29; Tr. at 31–38. Plaintiffs point chiefly to *Embry v. United States*, 100 U.S. 680, 25 L.Ed. 772 (1879), wherein the Supreme Court made the following statement: "No officer except the President or a judge of a court of the United States can claim a contract right to any particular amount of unearned compensation." 100 U.S. at 685. While this isolated sentence may be in plaintiffs' favor, the case it comes from is not. The holding of *Embry* is not that judges have a contract right to compensation while in office; in fact, the case is not about judges at

all, nor even about incumbent officeholders. Instead, *Embry* holds that non-judicial federal officers such as postmasters do not have a contract right to compensation while suspended from office. 100 U.S. at 685. Since judges can only be impeached, not suspended, *Embry* has no relevance here. At any rate, the sentence relied on by plaintiffs, besides being taken out of context, is wholly unnecessary to the holding of the case and thus a textbook example of *dicta.*

■ Plaintiffs claim that even if *Embry* is distinguishable, this case falls squarely under the rule of *Johnson v. United States,* 111 Ct.Cl. 750, 79 F.Supp. 208 (1948). Tr. at 66. Again, we disagree. *Johnson* involved a judge who resigned from office. The Court of Claims found that such a judge has a contract or property right to his retirement pay. 111 Ct.Cl. at 756, 79 F.Supp. at 211. Without assessing the validity of this *Johnson* holding today, we note that a judge who resigns (as the plaintiff did in *Johnson*) is no longer a federal officeholder. *Booth v. United States,* 291 U.S. 339, 348–50, 54 S.Ct. 379, 380–81, 78 L.Ed. 836 (1934). At best for plaintiffs, *Johnson* holds that judges who resign from office in reliance on future retirement payments may have a contract remedy. The *Johnson* case has no applicability to cases involving compensation for sitting Article III judges.[18]

Plaintiffs have cited no controlling authority indicating a possible contract claim. Pl. Reply at 27–29; Tr. at 31–37, 65–66. In our view, no such claim exists.

### V

Plaintiffs' contention that the extension of Social Security taxes to sitting Article III judges violated the Compensation Clause is a pure question of constitutional law. There are no material facts in dispute. Therefore, defendant is entitled to judgment on Counts I and II, (Second Am.Cplt. at 7–8), as a matter of law. RCFC 56(c).

Plaintiffs' contention that they have a contract right to compensation is likewise a pure question of law involving no disputed material facts. Therefore, defendant is entitled to judgment on the contract claim, (Count III, Second Am.Cplt. at 8–9), as a matter of law. RCFC 56(c).

Based on the foregoing, plaintiffs' motion for summary judgment is DENIED, and defendant's cross-motion for summary judgment is GRANTED. Accordingly, judgment shall be entered in favor of defendant.

Each party shall bear its own costs.

---

**18.** This conclusion is strengthened by the fact that the Court of Claims in *Johnson* did not once cite the *dicta* from *Embry* which, if read in isolation, indicates that sitting judges have a contract right to compensation.